# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1001

_____

United States of America,     *
                *
    Appellee,       *
                *  Appeal from the United States
   v.           *  District Court for the
                *  Northern District of Iowa.
Angela Jane Johnson,     *
                *
    Appellant.      *

_____

Submitted: February 14, 2007
Filed: July 30, 2007

_____

Before WOLLMAN, BYE, and SMITH, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

A federal jury found Angela Johnson guilty of aiding and abetting the murder of five individuals while working in furtherance of a continuing criminal enterprise (CCE), violations of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2, and five counts of aiding and abetting the killing of these individuals while engaging in a drug conspiracy, also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. The jury voted to impose the death penalty for four of these murders and voted to impose a sentence of life in prison for the fifth murder, resulting in a total of eight death sentences and two life sentences. Following her convictions, Johnson filed a motion in arrest of judgment, a motion for acquittal, and a motion for a new trial – all of

which were denied by the district court[1] in a comprehensive memorandum opinion. See United States v. Johnson, 403 F. Supp. 2d 721 (N.D. Iowa 2005). Johnson appeals from her convictions and her sentences, raising 28 issues.[2] We remand the case so that the district court may vacate five of her ten convictions. In all other respects, we affirm.

I.

As set forth in greater detail below, this case revolves around five murders. In July of 1993, Johnson's boyfriend, Dustin Honken, with Johnson's help, abducted and killed Greg Nicholson, Lori Duncan (Nicholson's girlfriend), and Duncan's two young daughters, Amber and Kandi. Nicholson, who had sold drugs for Honken, was the central witness in a drug case against Honken. The Duncans had the misfortune of being present when Honken and Johnson arrived at their home to deal with Nicholson. Months later, Honken, again with Johnson's assistance, murdered a second potential witness against Honken, Johnson's former boyfriend, Terry DeGeus.

In 1992, Honken started manufacturing methamphetamine with his friend Tim Cutkomp in Arizona. Honken's brother, Jeff Honken, financed the operation. Honken distributed the methamphetamine to Greg Nicholson and Terry DeGeus, who were both drug dealers in Mason City, Iowa. In early 1993, during one of Honken's trips to Mason City, DeGeus sent Johnson, who was his girlfriend at the time, to deliver either drug proceeds or methamphetamine to Honken. Johnson told Honken that because DeGeus was using too much of the methamphetamine for his own

---

[1]The Honorable Mark W. Bennett, then Chief Judge, United States District Court for the Northern District of Iowa.

[2]One of the issues Johnson raises, the admission of statements by Robert McNeese, has already been addressed by this Court. See United States v. Johnson, 352 F.3d 339 (8th Cir. 2003); United States v. Johnson, 338 F.3d 918 (8th Cir. 2003). Accordingly, we will not revisit the issue here.

personal use, Honken should deal directly with Johnson instead. Johnson and Honken began a romantic relationship and within six months, Johnson became pregnant with Honken's child. In late February or early March of 1993, Cutkomp moved to Iowa, but continued participating in Honken's drug enterprise.

In March 1993, police began investigating Nicholson and executed a search warrant for his residence, which led to the discovery of a large amount of methamphetamine and money. Nicholson agreed to cooperate with law enforcement and told agents that Honken had supplied him with several pounds of methamphetamine over a period of 10-11 months, for which he paid Honken a total of approximately $100,000. On March 21, 1993, Nicholson met with Honken to deliver drug proceeds. During their conversation, which was monitored by police, they discussed past and future deliveries of methamphetamine. That day, police arrested Honken and Cutkomp. In Honken's pocket, officers found a note listing money owed to Honken by two individuals referred to as "G-man" and "T-man." A receipt for the purchase of chemicals was found in Cutkomp's pocket. After Honken was arrested, Jeff Honken disposed of items from Honken's drug lab that Honken had kept in one of Jeff Honken's storage sheds.

In April 1993, a federal grand jury indicted Honken for conspiracy to distribute methamphetamine. Honken was released on bond. Honken informed the court that he intended to plead guilty, and a plea hearing was scheduled for July 30, 1993. During June and July of 1993, Honken and Johnson began searching for Nicholson. On the evenings they looked for Nicholson, Johnson would ask her friend, Christi Gaubatz, to babysit Johnson's daughter. Honken and Johnson borrowed Gaubatz's car on these occasions so that they would not be spotted by Nicholson. On July 7, 1993, Johnson purchased a semi-automatic 9 mm assault pistol at a pawn shop about

an hour's drive from her home.[3] The last time Johnson asked Gaubatz to babysit so that she and Honken could look for Nicholson was July 24, 1993. That evening, Nicholson, Nicholson's girlfriend, Lori Duncan, and Lori Duncan's two children, Kandi and Amber, were murdered.

Johnson later recounted the details of the murders to various witnesses. The following recitation is drawn from these accounts. Johnson knocked on the door of the Duncans' home and asked if she could look at their telephone book. Johnson was carrying a cosmetics demonstration bag and claimed that she had an appointment to give a demonstration, but was uncertain of the address. She secured entry into the house, with Honken apparently right behind her. There was testimony that once the door was opened, Honken and Johnson "rushed" the occupants. While Johnson and Honken were in the house, one or both of them videotaped Nicholson making statements exculpating Honken. At some point, Johnson went upstairs with Kandi and Amber and had them pack up some of their things – either to persuade the girls that they were going on a trip or to convince any subsequent visitors to the house that they had done so. Honken and Johnson bound and gagged the adults with materials that either Honken or Johnson had brought to the house and drove the victims to a wooded area. Honken took the two adults out of the car and shot them in the head while Johnson waited in the car with the children. The children were then taken out of the car and shot as well. All four were placed in a single grave that had been dug earlier. As set forth below, their bodies were eventually discovered years later.

After the murders, Honken provided his attorney with the videotape in which Nicholson exculpated Honken. When Honken appeared for his plea hearing, which took place five days after the murders, he declined to plead guilty. His attorney told

---

[3]There was testimony that this kind of weapon would not normally be used for hunting and would be more accurately characterized as an assault weapon.

the prosecutor that the case was not as strong as the government had believed. The tape was eventually returned to Honken and never seen again.

With Nicholson missing, the government's attention turned to DeGeus. On October 27, 1993, several individuals were subpoenaed, including Johnson and DeGeus's friend, Aaron Ryerson. Ryerson was questioned about possible connections between Honken and DeGeus. After Ryerson spoke with DeGeus, DeGeus called Johnson and told her what Ryerson had said to him about his time before the grand jury. Nine days later, on November 5, DeGeus dropped his daughter off at his parents' house and told them that he was going to meet with Johnson. By this time, DeGeus suspected that something may have happened to Nicholson, and he was concerned that he might share Nicholson's fate. Although DeGeus knew that Johnson was involved with Honken, he apparently agreed to meet with her because he still had strong feelings for her. DeGeus was murdered that night. The evidence indicates that DeGeus was either shot by Honken and then beaten with a baseball bat or beaten first and then shot.[4]

Following DeGeus's disappearance, Johnson gave conflicting reports to police and others about the night he disappeared, telling some individuals that she had not seen him that night and telling others that she had seen him, but that he had left after they had spoken. During the fall of 1993, Gaubatz found a bag containing a large black handgun, which had a silencer attached to it, in her closet. Upset by this discovery, Gaubatz called Johnson, who retrieved the weapon.

In March 1995, the federal drug charges against Honken were dismissed. In 1995, Honken enlisted the assistance of Dan Cobeen to help with the methamphetamine operation, but before Cobeen was allowed to participate, Honken

---

[4]One witness testified that Johnson had told her that Johnson aimed the firearm at DeGeus while Honken beat him.

took him to see Johnson for her approval. Unbeknownst to Honken or Johnson, however, Cobeen was cooperating with law enforcement and provided the authorities with information about the methamphetamine operation.

On February 7, 1996, before Honken and his associates were able to produce methamphetamine, law enforcement agents executed a search warrant for Honken's home, whereupon they seized items related to the production of methamphetamine. Two months later, the government brought drug charges against Honken and Cutkomp. After Honken's arrest, Honken and Johnson discussed killing witnesses, including Cobeen and law enforcement agents. Cutkomp testified that Honken was reluctant to involve Johnson in any efforts to kill Cobeen because she was a "hot head and just wanted to go do – just do it." Cutkomp was also worried about Johnson pushing Honken to follow through with the plans. Honken pled guilty to drug charges in 1997. Around the time of the sentencing hearing, Johnson called Jeff Honken and yelled, "[I]f Dustin wasn't going to be able to see his kids she was going to make sure [Jeff Honken wasn't] going to be able to see [his]."

Johnson was charged with the murders in July 2000 and taken to the Benton County, Iowa, Jail, where she met another inmate, Robert McNeese. McNeese convinced Johnson that he was connected to the mob and that he could find an inmate already serving a life sentence who would confess to the murders. He told her that all he needed was information about the crimes so that this inmate could convince the authorities of his involvement. Johnson obliged, providing maps depicting the location of the victims' bodies and information about how they were killed. McNeese then provided this information to the authorities. Using the maps, officers found Nicholson and the Duncan family in a single grave. The two adults were found bound and gagged and had been shot multiple times, suffering gunshots to the head. DeGeus's body was found a few miles away in a field behind an abandoned house. He had suffered multiple gunshot wounds, and his skull had been fractured into dozens of pieces.

Johnson's trial was trifurcated into three phases: a "merits" phase, in which the jury found her guilty of the murders, an "eligibility phase," in which the jury determined that she was eligible for the death penalty, and a "selection phase," in which the jury voted for the death penalty for Johnson's participation in the deaths of Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus. The jury voted for life imprisonment for Johnson's participation in Greg Nicholson's murder. In a separate trial, Honken was also convicted of the murders, but Honken, unlike Johnson, received life sentences for the murders of Lori Duncan and DeGeus.

II.

As indicated earlier, Johnson raises 28 issues on appeal. We will discuss in detail only those issues that we believe merit extended treatment, addressing the issues in roughly the same order as Johnson has presented them.

1.      The proportionality of Johnson's death sentences under the Eighth Amendment

Johnson argues first that the district court erred in denying her motion to strike the death penalty from the indictment. She contends that because Honken, the principal, received life sentences for the murders of DeGeus and Lori Duncan, imposing the death penalty for their murders upon Johnson, who had only aided and abetted the killings, would be a disproportionate punishment, in violation of the Eighth Amendment. She also contends that because she was a mere aider and abettor whose conduct did not lead to the deaths of the victims, she was ineligible for the death penalty for any of the murders. Johnson provides little support for her contention that a district court may strike the death penalty from the indictment despite the government's compliance with the statutory prerequisites for seeking the death penalty. Nevertheless, because Johnson also appears to articulate a freestanding Eighth Amendment claim, we will address the merits of her contention that the imposition of the death penalty would constitute cruel and unusual punishment.

We do not believe that the disparity between Honken's and Johnson's sentences violates the Eighth Amendment. While the Supreme Court has "occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual," Pulley v. Harris, 465 U.S. 37, 43 (1984), the Court's review has traditionally entailed "an abstract evaluation of the appropriateness of a sentence for a particular crime." Id. at 42-43. In other words, traditional proportionality review hinges on whether a particular kind of crime warrants a particular punishment. For example, the Court has concluded that imposing the death penalty for the rape of an adult woman "is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment." Coker v. Georgia, 433 U.S. 584, 592 (1977). Similarly, the Court has determined that the death penalty is a disproportionate penalty for a defendant who is guilty of felony murder, but who did not kill, attempt to kill, or intend or contemplate that a killing would occur. Enmund v. Florida, 458 U.S. 782, 801 (1982).

Johnson contends that the Eighth Amendment requires not only proportionality between a sentence and a particular category of crime, but also proportionality between codefendants' sentences. We disagree. The Supreme Court has rejected similar contentions, noting in McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987), that a defendant cannot "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." Id.; see also United States v. Chauncey, 420 F.3d 864, 876 (8th Cir. 2005) (remarking that "a defendant's sentence is not disproportionate merely because it exceeds his co-defendant's sentence"), *cert. denied*, 126 S. Ct. 1480 (2006). It bears mention, too, that although we assume that the government presented similar evidence in both Honken's and Johnson's trials, the evidence may have differed slightly. In particular, Johnson has not apprised us of the mitigation evidence Honken presented in his trial. Two juries hearing similar, but not identical, evidence may well reach different conclusions regarding the proper penalty for their respective defendants. In addition, different verdicts may permissibly reflect not only differences between the facts

presented at trial, but differences between the juries themselves. "Individual jurors bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." McCleskey, 481 U.S. at 310-11 (citation and quotation marks omitted). One cannot expect that two different juries – each of which is composed of citizens with diverse backgrounds and values – must necessarily reach the same verdict.

Johnson contends that Enmund supports the proposition that courts "must evaluate a defendant's culpability both individually and in terms of the sentences of codefendants and accomplices in the same case." (Appellant's Br. at 19). Johnson's reliance on Enmund is misplaced. In Enmund, two people were murdered during the course of a robbery while Enmund was sitting nearby in a car, waiting to help the robbers escape. Enmund was not present during the murders, did not intend that the victims be killed, and had not anticipated that "lethal force would or might be used if necessary to effectuate the robbery or a safe escape." Enmund, 458 U.S. at 788. Both Enmund and the codefendants who had actually committed the murders were sentenced to death. The Supreme Court concluded that a death sentence "is an excessive penalty for the robber who, as such, does not take human life," id. at 797, and that the death penalty was a disproportionate penalty for Enmund because he did not "kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Id. at 797. Enmund thus holds that the death penalty is too harsh a penalty for a certain category of crime.[5] In sum, we do not believe that Enmund

---

[5]Johnson's interpretation of Enmund apparently rests on a single passage in which the Court remarks that it was improper for Enmund to be treated as harshly as his more culpable codefendants. Enmund, 458 U.S. at 798. We do not believe that this isolated comment was intended to require proportionality between codefendants' sentences. Instead, the Court was making the more unexceptional observation that those who kill or intend to kill, such as Enmund's codefendants, are, as a class, more culpable and more deserving of greater punishment than those like Enmund, who do not. Moreover, the Court stated only a few lines earlier that the "focus must be on [Enmund's] culpability, not on that of those who committed the robbery and shot the

assists Johnson, and we reject her contention that the disparity between her sentence and Honken's violates the Eighth Amendment. See Hatch v. Oklahoma, 58 F.3d 1447, 1466-67 (10th Cir. 1995) (holding that the Eighth Amendment does not require codefendants' sentences to be proportional to one another).

Johnson also argues that the death penalty was disproportionate under Enmund and Tison v. Arizona, 481 U.S. 137 (1987), because she was only minimally involved in the murders, the deaths did not result from her actions, and she had not foreseen that life would be taken. We conclude that these contentions are unavailing. First, there was evidence that the killings resulted from her substantial participation in the murders; namely, that she procured the murder weapon, participated in the hunt for Nicholson, employed a ruse so that she and Honken could gain entry to the Duncans' residence, bound and gagged at least one of the victims, and exploited her relationship with DeGeus to lure him to the remote location where he was killed. There was thus sufficient evidence that Johnson was an essential participant in the murders.

There was also evidence that she intended that the killings occur. First, the jury reasonably rejected Johnson's suggestion that she had, at most, intended to participate in kidnaping Nicholson and the Duncans. Nicholson was a potential witness; if he remained alive there would be a danger that he might recant the exculpatory remarks he made about Honken in the videotape. The Duncans were witnesses to Honken's and Johnson's treatment of Nicholson. To be efficacious for Honken's and Johnson's purposes, a kidnapping would have necessarily constituted an involved, long-term affair. There was no evidence that any such scheme was in the works.[6] As for DeGeus's murder, the jury could have concluded that Johnson lured DeGeus to a

_____

victims, for we insist on individualized consideration as a constitutional requirement in imposing the death sentence." Id. (citation and quotation marks omitted).

[6]Although Johnson had the girls pack some things, this was a ruse to convince either the girls or others that they were going away somewhere.

secluded location where Honken could kill him, particularly in light of the fact that Johnson knew that Honken had killed Nicholson and the Duncans months earlier.

2.      Federal Rule of Criminal Procedure 24(b) and Equal Protection

Johnson next argues that Federal Rule of Criminal Procedure 24(b) violates her equal protection rights. Under Fed. R. Crim. P. 24(b), defendants in non-capital felony cases are entitled to ten peremptory challenges, whereas the government receives six challenges. In a capital case, however, both the defendant and the government receive twenty peremptory challenges. Fed. R. Crim. P. 24(b)(1). Johnson argues that Rule 24(b) violates her equal protection rights because defendants in non-capital cases have a more favorable ratio of peremptory challenges vis-á-vis the government than do defendants in capital cases. Johnson's argument is unavailing.

We reject first Johnson's suggestion that because Rule 24(b) burdens a fundamental constitutional right strict scrutiny applies. Peremptory challenges are not "of federal constitutional dimension." United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000). Instead, the right to peremptory challenges "is in the nature of a statutory privilege," Frazier v. United States, 335 U.S. 497, 506 n.11 (1948), provided to help secure the defendant's constitutional right to a fair trial. Id. at 505. We also reject Johnson's argument that Rule 24(b) fails rational-basis review. Johnson contends that if defendants need more peremptories than the government in non-capital cases, then defendants also need more peremptories than the government in capital cases. Rational-basis review, however, does not require a perfect or exact fit between the means used and the ends sought. Banker's Life & Cas. Co. v. Crenshaw, 486 U.S. 71, 85 (1988) (noting that a statute need not be "perfectly calibrated in order to pass muster under the rational-basis test"). The legislature is not required to calculate with precision the exact number of challenges necessary to help secure the defendant's right to a fair trial. Nor is the legislature required to arrive at a perfect

-11-

defendant-to-government ratio. Although the government does not squarely proffer a reason for the disparity between the ratio of government-to-defendant challenges in capital and non-capital cases, its briefing suggests, and the progress of this case confirms, that in a capital case, the venire panel's views on the death penalty become the primary pivot around which jury selection turns. The government and the defense arguably have an equal interest in exploring the jurors' attitudes. Rule 24(b) may not be "perfectly calibrated," perhaps, but it passes rational-basis muster.

3.      Johnson's Sixth Amendment rights and her right to peremptory challenges

Johnson argues that her Sixth Amendment right to an impartial jury was violated because the district court erroneously denied her for-cause challenges to more than a dozen jurors. She also contends that the district court's error impaired her right to exercise peremptory challenges because she was forced to expend a number of her peremptory challenges on jurors who should have been excused for cause.

A.      Sixth Amendment argument

Because Johnson exercised peremptory challenges to prevent all the challenged jurors except juror 600 from sitting on her jury, juror 600 is the only juror about whom she can raise a Sixth Amendment objection. See United States v. Nelson, 347 F.3d 701, 710 (8th Cir. 2003) (claim that district court erred by not excluding four penalty-phase jurors for cause lacked merit because the defendant had used peremptory challenges to prevent the challenged jurors from sitting on the jury); United States v. Paul, 217 F.3d 989, 1004 (8th Cir. 2000) (noting that the defendant's claim on appeal concerning district court's denial of challenge for cause was unavailing because, *inter alia*, the three challenged jurors did not sit on the jury).

The district court did not abuse its discretion in denying Johnson's motion to strike juror 600. A venireperson may be properly excluded from sitting in a capital

case if the venireperson's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985). "Because the trial judge is in the best position to analyze the demeanor and credibility of a venireman, we will not reverse a court's rulings absent an abuse of discretion." United States v. Ortiz, 315 F.3d 873, 888 (8th Cir. 2002); see also Uttecht v. Brown, 2007 U.S. Lexis 6965, *12-17 (June 4, 2007) (concluding that a trial judge's determinations regarding substantial impairment should be accorded deference). Johnson contends that juror 600 should have been struck because he stated that his empathy for the victim's family and the fact that the crime involved children could affect his judgments about the case. She also asserts that juror 600 would not consider any deals that a prisoner may have received or might hope for in weighing the prisoner's testimony. Although the juror gave some equivocal answers and acknowledged the possibility that his judgment could be affected by some aspects of the case, the district court concluded that juror 600 could be fair and impartial and that his statements reflected the "reasonable self doubts" of a conscientious and reflective person. Moreover, although he initially indicated little interest in whether witnesses hoped for sentencing reductions in exchange for their testimony, juror 600 stated that he would consider the motivations of witnesses in testifying and acknowledged the "real possibility" that some witnesses might lie to obtain some sort of benefit. We therefore cannot say that the district court abused its discretion in denying Johnson's for-cause challenge to this juror.

B.     Impairment of her right to exercise peremptory challenges

Johnson contends also that her statutory entitlement to twenty peremptory challenges was impaired because she was, as she puts it, forced to "waste" 60% of her peremptory challenges on jurors who should have been stricken for cause. We disagree. In Martinez-Salazar, the Supreme Court held that a defendant's right to exercise peremptory challenges is not impaired when the defendant elects to use her challenges to remove jurors who should have been stricken for cause. Martinez-

-13-

Salazar, 528 U.S. at 317. In reaching this conclusion, the Court noted that peremptory challenges are "auxiliary" to the right of an impartial jury and that they are one means of ensuring a fair trial, but are not themselves of "federal constitutional dimension." Id. at 311; see also Frazier, 335 U.S. at 505 ("the right [to peremptory challenges] is given in aid of the party's interest to secure a fair and impartial jury . . ."). Accordingly, Johnson did not, to use her phrase, "waste" her peremptory challenges. Instead, she "used the challenge[s] in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury." Martinez-Salazar, 528 U.S. at 316.[7]

Johnson suggests that her case is distinguishable from Martinez-Salazar because unlike Martinez-Salazar, who "did not ask for a makeup peremptory or object to any juror who sat," id. at 318 (Souter, J., concurring), Johnson requested additional peremptory challenges and objected to juror 600. She also asserts that her case is distinguishable, both from Martinez-Salazar, as well as cases applying Martinez-Salazar, because of the sheer number of challenges she expended in removing jurors that she thought should have been removed for cause. We do not consider this sufficient reason to depart from the Martinez-Salazar rule. The language used by the Court does not suggest that the rule of law Martinez-Salazar enunciates hinges on how many peremptory challenges the defendant exercised for curative purposes or how the defendant would have otherwise employed her challenges if she had not used them curatively. The constitutional touchstone, we believe, is the right to a fair trial, and we are not persuaded that Johnson has been deprived of this right. Nor has she shown that her jury or the voir dire process was constitutionally objectionable in any other

_____

[7]Nor can we agree that Johnson was "forced" to use her challenges in this manner. As the Supreme Court remarked, a defendant who must make a snap decision during jury selection to either use a peremptory challenge to cure an erroneous denial of a for-cause challenge or take her chances on appeal is undoubtably faced with a difficult choice, but a "hard choice is not the same as no choice." Martinez-Salazar, 528 U.S. at 315. Johnson "received and exercised" all twenty of her peremptory challenges, which is all "[s]he is entitled to under the Rule." Id.

-14-

way. Because Johnson received the twenty challenges to which she was entitled under Rule 24, and because she has not shown that she was denied either the right to a fair trial or any other constitutional right, we conclude that her claim is unavailing.[8]

4.      The denial of Johnson's request for additional peremptory challenges

The district court denied Johnson's request for additional peremptory challenges beyond the twenty to which she was entitled under Rule 24. Johnson contends that the denial was improper because she needed the additional challenges to cure the effects of pretrial publicity. Assuming for the sake of argument that the district court had the authority to grant additional peremptory challenges, we cannot discern any error in the denial of Johnson's motion. Johnson was able to challenge for cause jurors adversely affected by pretrial publicity and, if those challenges were denied, exercise her peremptory challenges. She does not appear to allege that any of the sitting jurors were prejudiced by pretrial publicity. Moreover, as the district court noted, the responses to the juror questionnaires indicated that the influence of pretrial publicity did not appear likely to impair Johnson's ability to receive a fair trial. Johnson, 403 F. Supp. 2d at 721, 768-69. If Johnson had felt that the voir dire testimony of the jurors belied that conclusion, she could have elected to renew her motion for a change of venue during, or at the conclusion of, jury selection, but she did not. Id. In light of the foregoing, we cannot say that the district court erred in declining to provide Johnson with a greater number of peremptory challenges than the 20 provided by Rule 24(b).

---

[8]We note that Johnson does not contend that "the trial court deliberately misapplied the law in order to force [her] to use a peremptory challenge to correct the court's error." Martinez-Salazar, 528 U.S. at 316.

5.     The district court's exclusion of two jurors

Johnson argues that the district court erred in striking for cause jurors 458 and 769. When juror 458 was asked if he would consider the death penalty an appropriate punishment for an intentional murder, he responded, "I'd have to say no," adding, "I believe in mercy too." Shortly thereafter he stated, "Well, I think living with the guilt is penalty enough in my opinion. You know, how much worse can it get?" He also remarked that he would vote for a life sentence without the possibility of parole 99% of the time. The district court's determination that this juror was substantially impaired was not an abuse of discretion.

Juror 769 gave markedly inconsistent and equivocal answers to the questions posed to her in the juror questionnaire and during voir dire, and twice expressed reservations about her ability to sign a verdict slip that would have the practical effect of sentencing someone to death. The district court remarked that juror 769 "was the quintessential example of a juror whose answers were so equivocal, ambiguous, and inconsistent, that the court was entitled, if not absolutely required, to remove her for cause." Johnson, 403 F. Supp. 2d at 784. We cannot say that excluding this juror constituted an abuse of discretion.

6.     The prosecutor's statements to the jurors that the jurors were permitted to give no weight to various mitigating factors

Johnson contends that the district court erred in allowing the prosecutor to tell jurors during voir dire that, although they were required to consider them, the jurors were permitted to give certain mitigating evidence "no weight" in determining Johnson's sentence. Johnson also asserts that the prosecutor improperly stated during the selection-phase closing arguments that the jurors should not give any weight to the fact that Johnson had no prior criminal record.

-16-

Sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982). A capital jury is not required "to give mitigating effect or weight to any particular evidence." Paul, 217 F.3d at 999-1000 (citing Boyde v. California, 494 U.S. 370, 377 (1990)). "There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence." Id. at 1000 (citing Boyde, 494 U.S. at 386).[9] Based on our review of the voir dire transcript, particularly those portions of the transcript to which Johnson draws our attention, we conclude that the prosecutor's comments and questions accurately reflected the law: jurors are obliged to consider relevant mitigating evidence, but are permitted to accord that evidence whatever weight they choose, including no weight at all.

We also reject Johnson's contention that the prosecutor improperly urged the jury to accord no weight to the fact that Johnson had no prior criminal record. The prosecutor did not suggest that the jury was permitted to exclude this factor from its consideration. Instead, the prosecutor acknowledged that Johnson had no prior criminal record, but suggested that this fact should be accorded no weight because there was evidence that Johnson had committed various crimes for which she had not been arrested or charged.[10]

---

[9]Jurors may believe themselves precluded from considering relevant mitigation evidence not only as a result of the judge's instructions, "but also as a result of prosecutorial argument dictating that such consideration is forbidden." Abdul-Kabir v. Quarterman, 127 S. Ct. 1654, 1672 n.21 (2007).

[10]Because the prosecutor acknowledged during closing argument that Johnson had no prior criminal record, we reject the government's contention on appeal that the closing argument was appropriate because "criminal record" for mitigation purposes also encompasses uncharged criminal conduct.

-17-

7.    Sufficiency of the evidence

Johnson argues that the evidence was insufficient to show that the murders were committed in furtherance of a conspiracy and that the government failed to establish the elements of CCE murder.

A. Conspiracy Murder

Johnson asserts first that the murders could not have been committed in furtherance of a drug conspiracy because the conspiracy had ended in late 1992 when Cutkomp left Arizona and Honken told his brother that he was going to stop producing methamphetamine. This assertion is incorrect because, despite what Honken may have told his brother, and despite Cutkomp's move to Iowa, the evidence, including the evidence of the events culminating in Honken's March 1993 arrest, demonstrates that Honken and Cutkomp had in fact continued their methamphetamine-related activities. Johnson also suggests that the conspiracy terminated no later than March 1993, when Honken and others were arrested and Nicholson began cooperating with the authorities. A conspiracy may persist, however, "even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." United States v. Roach, 164 F.3d 403, 412 (8th Cir. 1998).

Here, in addition to the murders undertaken to preserve the conspiracy, cf., United States v. Hamilton, 332 F.3d 1144, 1149-50 (8th Cir. 2003) ("Eliminating a witness to a murder at the drug house could logically be seen to further the conspiracy by making it less likely that the operation would be shut down as a result of a murder investigation."), there was sufficient evidence to support a finding that a conspiracy to manufacture and sell methamphetamine, with Honken at its center, continued from 1992 through 1996, Honken's 1993 arrest notwithstanding. A couple of months after Honken was arrested, Honken asked Cutkomp to obtain chemicals so that Honken

could produce more methamphetamine that Honken could sell to pay off Nicholson or DeGeus. Although Cutkomp did not complete that particular task, he testified that from the time of the disappearances through about 1995, he occasionally assisted Honken in Honken's attempts to manufacture methamphetamine. Cutkomp's participation also included trips to purchase chemicals in 1995 and the disposal of evidence in 1996. Johnson participated also. In addition to her role in the murders, in 1994, Johnson supplied money to purchase chemicals, and some of Honken's attempts to manufacture methamphetamine took place at Johnson's home.

B. CCE Murder

Johnson also argues that the government failed to prove the elements of CCE murder. To establish CCE murder, the government must prove: 1) that an individual is engaged in or working in the furtherance of a CCE; 2) that this person intentionally commanded, induced, procured or caused the killing; 3) that the killing actually resulted; and 4) that there was a substantive connection between the killing and the CCE. See United States v. Jones, 101 F.3d 1263, 1267 (8th Cir. 1996). Here, Johnson was charged with aiding and abetting a CCE murder.[11] Consequently, the district court instructed the jury that the second element of the offense would be met if Johnson aided and abetted the killing. The CCE alleged in this case was the drug operation organized by Honken. To establish the existence of this CCE, the government was required to prove: 1) that Honken committed a felony violation of the federal narcotics laws; 2) as part of a continuing series of three or more violations; 3) in concert with five or more other persons; 4) for whom Honken was an organizer, manager, or supervisor; 5) from which Honken derived substantial income or

---

[11]Johnson argues that liability as an aider and abettor is inapplicable to CCE murder. As Johnson appears to recognize, however, all of the cases cited by the parties on this issue have reached the contrary conclusion. See, e.g., United States v. Walker, 142 F.3d 103, 113 (2d Cir. 1998) (concluding that "aider and abettor liability is available" for CCE murder).

-19-

resources.  See United States v. Jackson, 345 F.3d 638, 645 (8th Cir. 2003) (citing United States v. Jelinek, 57 F.3d 655, 657 (8th Cir. 1995)).

Johnson alleges several infirmities in the government's CCE murder case.  She contends first that the CCE, like the conspiracy, had ended before the murders took place, reiterating the arguments she made regarding the conspiracy murder charge. For essentially the same reasons stated above, we conclude that this contention lacks merit.  She also asserts that Honken did not supervise five or more CCE participants. In particular, she contends that two of the alleged CCE participants, Nicholson and DeGeus, were not managed by Honken because they had only a buyer-seller relationship with him.[12]  We disagree.  The "management element is established by demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms."  United States v. Possick, 849 F.2d 332, 336 (8th Cir. 1988).  There was evidence that Nicholson and DeGeus were not merely customers, but were directed by Honken in a drug distribution scheme.  They were often described as having sold drugs "for" Honken, and the evidence indicates that Honken "fronted" them the drugs, that they remitted some of their drug proceeds to Honken, and that this was an ongoing relationship coordinated by Honken.  Cf. Possick, 849 F.2d at 336 (noting that although merely fronting drugs to another person will not suffice to establish supervision, supervision may be found where the defendant fronted another individual drugs and instructed him how to arrange for collection and payment of drugs); United States v. Apodaca, 843 F.2d 421, 427 (10th Cir. 1988) (explaining that drug dealers who were fronted drugs by the defendant – to whom they passed back a portion of the proceeds from the drug sales – were not

---

[12]Johnson also contests Jeff Honken's classification as a CCE participant. There was evidence that Jeff Honken provided money to Honken in exchange for a portion of the drug proceeds, allowed Honken to store equipment in his sheds, and disposed of drug equipment upon Honken's 1994 arrest.  This activity suffices to establish Jeff Honken's participation in the CCE under his brother's supervision.

mere "consumers"). The quantity of drugs coupled with the ongoing relationship also suggests that Nicholson and DeGeus were not merely Honken's customers. See United States v. Prieskorn, 658 F.2d 631, 634-35 (8th Cir. 1981) (noting that the large quantity of cocaine and evidence of an ongoing relationship with suppliers indicated participation in conspiracy). We also note that Nicholson stored drugs for Honken. In sum, we conclude that Honken supervised Nicholson and DeGeus and that the elements of CCE murder were established.[13]

8.     Admission of evidence relating to Honken's guilty plea

Johnson moved *in limine* for the exclusion of evidence pertaining to Honken's 1997 guilty plea, conviction, and sentence. Although she appears to agree that the fact of Honken's 1997 conviction was relevant, she argued to the district court that neither Honken's sentence nor the "particular crimes" with which Honken was charged and to which he pled guilty were relevant. The government responded that evidence of the specific charges was relevant to provide context for statements that Honken made to Cutkomp and Cobeen, but agreed that the sentence was not relevant. The district court ordered that evidence of the sentence be excluded, but ruled that evidence pertaining to the specific charges would be admitted. Accordingly, the government was permitted to introduce exhibits 303 and 304, which reflected the crimes with which Honken was charged, the sentences he received, and the amount of methamphetamine for which he was held accountable. The government was also allowed to introduce the transcript of Honken's plea colloquy. During the merits-phase closing arguments, one of the prosecutors stated, "There were two [violations] for which [Honken] pled guilty, Exhibits 303 and 304. In the evidence in this case — and you'll have them back in the jury room — set forth his guilty plea and conviction as to two federal felony drug convictions."

---

[13]We have considered carefully Johnson's other contentions regarding the elements of the CCE murder and conclude that they lack merit.

Johnson contends that the two exhibits should not have been admitted and that the prosecutor improperly used this evidence of Honken's guilty plea as substantive evidence of Johnson's guilt. Cf. United States v. Rogers, 939 F.2d 591, 594 (8th Cir. 1991) (per curiam) ("Any time a guilty plea of a co-offender is either directly or indirectly brought into a trial, trial courts must ensure that it is not being offered as substantive proof of the defendant's guilt."). We conclude that even if these exhibits were improperly admitted or used for an improper purpose, any error was harmless. Although Johnson argues that the jury should not have learned which specific crimes were involved, a reasonable juror who heard the other trial evidence would have assumed that the crimes in question involved methamphetamine. Similarly, the prospect of prejudice was diminished because, even without evidence of the guilty pleas, there was overwhelming evidence of Honken's participation in methamphetamine-related crimes during the relevant period of time. Finally, Johnson's defense did not center on whether or not Honken was involved in drug crimes, but rather on whether Johnson had knowingly participated in the murders.

9.     Admission of bad acts evidence

Johnson argues next that the district court erred in permitting the introduction of evidence pertaining to bad acts committed subsequent to the murders, some of which took place years after the killings. She asserts that these bad acts were either more prejudicial than probative under Federal Rule of Evidence 403 or constituted impermissible propensity evidence pursuant to Federal Rule of Evidence 404(b). We disagree. Johnson was charged with murders committed in furtherance of a methamphetamine conspiracy and a CCE that allegedly extended from 1992 through 1998. Most of the bad acts to which Johnson refers on appeal relate to Johnson's participation in the production of methamphetamine or her attempts to influence witnesses to Honken's methamphetamine offenses, which were relevant to establish

the existence of, and Johnson's involvement in, the conspiracy or CCE.[14] Indeed, one of the subsequent bad acts about which Johnson complains, evidence that she possessed chemicals and equipment related to the manufacture of methamphetamine at her home in Clear Lake, Iowa, was one of the alleged predicate offenses.

Johnson devotes most of her discussion of this issue to the admission of testimony by Rick Held, an acquaintance of Honken's. Held testified that in 1998, a woman identifying herself as Honken's girlfriend called him on the telephone and told him that Honken did not need a "pup" (which evidently referred to a firearm that Honken had asked Held to acquire for him) anymore. Johnson suggests that this testimony should not have been admitted because Honken had two girlfriends and thus the statement could not have been properly attributed to Johnson. There was evidence, however, from which the jury could infer that it was Johnson who made this call, rather than another girlfriend. Having examined the record, we conclude that admission of the other subsequent bad acts evidence was proper as well.[15]

10.    Admission of hearsay statements

Johnson contends that the admission of certain hearsay statements violated both her confrontation rights as well as the Ex Post Facto Clause of the Constitution. Because most of the statements to which Johnson objects were made by Nicholson and DeGeus, we will devote most of our analysis to the admission of these

---

[14]Some of this evidence may have been relevant and admissible for other purposes as well.

[15]Johnson also contends, without supporting argument, that the district court erred in failing to give Johnson's proposed jury instructions on subsequent acts. We disagree.

statements.[16] Nicholson's and DeGeus's hearsay statements were admitted pursuant to the forfeiture by wrongdoing doctrine as codified by Federal Rule of Evidence 804(b)(6). As we explained in United States v. Emery, 186 F.3d 921 (8th Cir. 1999), a defendant's confrontation rights under the Sixth Amendment are "forfeited with respect to any witness or potential witness whose absence a defendant wrongfully procures." Id. at 926. "Hearsay objections are similarly forfeited under Fed. R. Evid. 804(b)(6), which excludes from the prohibition on hearsay any 'statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.'" Id. (quoting Fed. R. Evid. 804(b)(6)). Forfeiture under Rule 804(b)(6) applies not only in the original cases for which the declarant was an actual or potential witness, but also in any prosecution pertaining to the wrongful procurement of the witness's unavailability. Id. In Emery, for example, the defendant murdered the woman who was cooperating with law enforcement in a drug investigation against him. Id. at 924-26. We concluded that Emery had forfeited his hearsay and confrontation objections not only with respect to "a trial on the underlying crimes about which he feared [the victim] would testify," but also "in a trial for murdering her." Id. at 926.

---

[16]We have considered Johnson's other assertions regarding the admission of hearsay in the merits phase and conclude that they lack merit.

A. Ex Post Facto Clause

Johnson argues that the Ex Post Facto Clause of the Constitution precludes the application of the forfeiture by wrongdoing doctrine in her case because the rule of evidence codifying the doctrine, Rule 804(b)(6), was enacted four years after the murders took place. The argument lacks merit because Rule 804(b)(6) reflects legal principles that were well and widely recognized at the time of the murders. See Fed. R. Evid. 804, notes of advisory committee on 1997 amendments (collecting cases).

Moreover, even if the enactment of Rule 804(b)(6) had enlarged the category of admissible evidence in a criminal case, we doubt that this would constitute an *ex post facto* violation. The Ex Post Facto Clause prohibits, *inter alia*, the application of any "law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender." Calder v. Bull, 3 U.S. 386, 390 (1798) (opinion of Chase, J.). Laws that "'simply enlarge the class of persons who may be competent to testify in criminal cases' do not offend the *ex post facto* prohibition because they do not . . . alter the degree or lessen the amount or measure of proof necessary to convict the defendant." Palmer v. Clarke, 408 F.3d 423, 430-31 (8th Cir. 2005) (quoting Hopt v. Utah, 110 U.S. 574, 589 (1884)), *cert. denied sub nom.* Palmer v. Houston, 546 U.S. 1042 (2005). Accordingly, even if the enactment of Rule 804(b)(6) had enlarged the class of admissible hearsay, this expansion would not violate the Ex Post Facto Clause. We thus find unavailing Johnson's *ex post facto* objection to Rule 804(b)(6).

B. Applicability of the Forfeiture by Wrongdoing Doctrine

Johnson also contends that her case is distinguishable from Emery and that the forfeiture by wrongdoing doctrine is inapplicable because she did not endeavor to procure the unavailability of any witnesses against her. She also contends that the doctrine could not apply to her because she had been accused only of aiding and

-25-

abetting the murders. The question, therefore, is whether the doctrine applies when a defendant aids and abets the murder of a potential witness against another person. We conclude that it does.

We observe first that the scope of the forfeiture by wrongdoing doctrine under common law may differ from the version of the doctrine established by Rule 804(b)(6). The Sixth Circuit in United States v. Garcia-Meza, 403 F.3d 364 (6th Cir. 2005), noted that although Rule 804(b)(6) may require that the defendant intend to procure a witness's unavailability to testify, under the common law forfeiture doctrine a defendant's confrontation rights may be extinguished even if her misconduct was not specifically directed toward rendering the witness unavailable. Id. at 370. Because the requirements for forfeiture under Rule 804(b)(6) are arguably more stringent than those under the common law version of the doctrine, a matter we need not and do not resolve today, and because the statements at issue here must, in any case, be admissible under the Federal Rules of Evidence (any forfeiture of Johnson's confrontation rights notwithstanding), our analysis will focus on the requirements of the Rule 804(b)(6).

The fact that Johnson may have only aided and abetted the procurement of the witnesses' unavailability is of little moment. If a defendant's role as an aider and abettor may constitute sufficient participation in a murder to warrant the imposition of a death sentence, such conduct should also suffice for the forfeiture of hearsay and confrontation objections. In other words, it "would make little sense to limit forfeiture of a defendant's trial rights to a narrower set of facts than would be sufficient to sustain a conviction and corresponding loss of liberty." United States v. Cherry, 217 F.3d 811, 818 (10th Cir. 2000); see also United States v. Carson, 455 F.3d 336, 364 (D.C. Cir. 2006) (suggesting that if members of a conspiracy agree to kill potential witnesses against them, all of the members of the conspiracy would be criminally responsible for resulting murders and "there is no good reason why the murder should give any of them an evidentiary advantage"), *cert. denied*, 127 S. Ct. 1351 (2007).

Furthermore, Rule 804(b)(6) applies when a defendant has "engaged or acquiesced in wrongdoing" procuring a witness's unavailability. We believe that this language encompasses Johnson's substantial involvement in procuring the witnesses' unavailability.

We also conclude that Rule 804(b)(6) applies to Johnson even though she had worked to procure the unavailability of potential witnesses against Honken rather than against herself. "'Because the Federal Rules of Evidence are a legislative enactment, we turn to the traditional tools of statutory construction in order to construe their provisions. We begin with the language itself.'" United States v. Gray, 405 F.3d 227, 241 (4th Cir. 2005) (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 163 (1988)), *cert. denied*, 546 U.S. 912 (2005). The words of Rule 804(b)(6) provide only that the defendant must procure the unavailability of a witness – they do not specify the person against whom the unavailable witness was to have testified. After all, the purpose of Rule 804(b)(6), as the advisory committee to the Federal Rules of Evidence stated, was to enact a "prophylactic rule to deal with abhorrent behavior which strikes at the heart of the system of justice itself." Fed. R. Evid. 804(b)(6), notes of advisory committee on 1997 amendments (citation and quotation marks omitted). Johnson's conduct was no less abhorrent and no less offensive to "the heart of the system of justice itself" because she procured the unavailability of witnesses against Honken rather than against herself. Moreover, applying Rule 804(b)(6) in Johnson's case is consonant with the equitable rationales for the forfeiture by wrongdoing doctrine, which includes preventing individuals from profiting from their own wrongdoing. Gray, 405 F.3d at 242 (collecting cases and observing that "federal cases have recognized that the forfeiture-by-wrongdoing exception is necessary to prevent wrongdoers from profiting by their misconduct"). We also observe that in conspiracy cases, witnesses' cooperation with the government threatens not only the liberty of the particular conspirators against whom the witness may testify, but the viability of the conspiracy as a whole; and an investigation or prosecution that might start with one conspirator may result in charges being levied against other conspirators

as well.  In sum, it would make little sense in a case such as this to parse the forfeiture doctrine as finely as Johnson proposes.  We conclude that the district court reasonably found by a preponderance of the evidence that Johnson had forfeited her confrontation and hearsay objections to the admission of statements by Nicholson and DeGeus.[17]

11.   Commentary on Johnson's post-arrest, post-<u>Miranda</u> warnings silence

During the government's merits-phase closing arguments, one of the prosecutors argued that if Johnson had been tricked by Honken into participating in the murders, as she essentially claimed, she would have said so when she spoke about the murders with various individuals.  The prosecutor also displayed a chart during closing argument that read as follows:

> Gaubatz: no claim of innocence
> McNeese: no claim of innocence
> Bramow: no claim of innocence
> S. Johnson & W. Jacobson: no claim of innocence
> Baca: no claim of innocence
> Hoover: no claim of innocence
> Yager: no claim of innocence

Johnson contends that the prosecutor's remarks and his use of the chart was tantamount to improper commentary on her failure to testify and on her post-arrest

---

[17]Johnson asserts that the forfeiture rule is inapplicable because she did not knowingly or intentionally waive her confrontation rights.  This argument is unavailing, as courts have consistently concluded that the forfeiture by wrongdoing doctrine rests on the defendant's wrongdoing rather than on a knowing and intelligent waiver.  <u>See, e.g,</u> <u>People v. Giles</u>, 152 P.3d 433, 442-43 (Cal. 2007) (explaining that the forfeiture by wrongdoing doctrine is based on forfeiture rather than waiver); <u>State v. Hallum</u>, 606 N.W.2d 351, 355 (Iowa 2000) ("[T]he loss of a defendant's right to object is based on a forfeiture theory because the loss rests on the defendant's misconduct, not on the defendant's relinquishment of a known right.").

silence. We disagree. We cannot see how any of the prosecutor's remarks could be reasonably interpreted as a comment on Johnson's decision to not testify. Johnson asserts that the prosecutor's remarks implied that Johnson was under an obligation to proclaim her innocence, but that plainly was not what the prosecutor was arguing. The prosecutor was contending instead that the jury could infer, relying on its common sense understanding of human motivations, that if Johnson had been duped by Honken, she would have stressed that detail when she spoke with others about the crimes. As for the chart, we do not believe that it constitutes either a direct or indirect comment on Johnson's failure to testify. Cf. Graham v. Dormire, 212 F.3d 437, 439 (8th Cir. 2000) (stating that a prosecutor may not directly comment on a defendant's failure to testify and that an indirect comment is impermissible if it manifests "the prosecutor's intent to call attention to a defendant's failure to testify or would be naturally and necessarily taken by a jury as a comment on the defendant's failure to testify").

Nor was there improper commentary on Johnson's post-arrest silence. Ordinarily, a defendant's post-arrest, post-*Miranda* warnings silence may not be used against her. Doyle v. Ohio, 426 U.S. 610, 619-20 (1976). The reasons for this rule are two-fold:  1) such silence may be nothing more than an arrestee's exercise of her constitutional rights; and 2) because the Miranda warnings carry an "implicit assurance" that an arrestee's silence will not be used against her, using her silence would unfairly penalize her for relying on these assurances. United States v. Frazier, 408 F.3d 1102, 1110 (8th Cir. 2005) (citing Doyle, 426 U.S. at 617-18), *cert. denied*, 126 S. Ct. 1165 (2006). We have observed, however, that the "'privilege against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when [s]he is under no official compulsion to speak.'" Frazier, 408 F.3d at 1110 (quoting Jenkins v. Anderson, 447 U.S. 231, 241 (1980) (Stevens, J., concurring)). In other words, "in determining whether the privilege [to remain silent] is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent." Jenkins,

-29-

447 U.S. at 244 (Stevens, J., concurring). Thus, we concluded in <u>Frazier</u> that testimony regarding a defendant's post-arrest, pre-<u>Miranda</u> silence does not necessarily constitute a <u>Doyle</u> violation because the mere fact of arrest does not itself give rise to a "government-imposed compulsion to speak" triggering the assertion of an arrestee's Fifth Amendment privilege. <u>Frazier</u>, 408 F.3d at 1111. Here, Johnson's silence was not an exercise of her privilege to remain silent because she was under no official compulsion against which such a privilege would be asserted. Nor is there any reason to believe that Johnson was somehow relying on an implicit assurance by the government that her silence would not be used against her. <u>Cf.</u> <u>Fletcher v. Weir</u>, 455 U.S. 603, 606 (1982) (per curiam) ("[W]e have consistently explained <u>Doyle</u> as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."). In sum, as the district court observed, "Johnson has not shown how, when, or why her right to remain silent had attached as to any of these witnesses." <u>Johnson</u>, 403 F. Supp. 2d at 828.[18]

---

[18]<u>Doyle</u> may also be inapplicable here because Johnson was not silent about the murders, but elected to speak. <u>See</u> <u>Anderson v. Charles</u>, 447 U.S. 404, 408 (1980) ("<u>Doyle</u> does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving <u>Miranda</u> warnings has not been induced to remain silent."); <u>see also</u> <u>United States v. DeVore</u>, 839 F.2d 1330, 1332 (8th Cir. 1988) ("[A] defendant who chooses to speak after being given proper <u>Miranda</u> warnings and who at trial gives a different account of the same events is subject to cross-examination about the prior statement."). Because we resolve this issue on the basis already stated, we need not explore this possibility further.

12.	Merits-phase jury instructions

Johnson's next claim of error concerns the district court's instructions to the jury pertaining to the merits phase of the trial.

Johnson contends that the district court should have given her proposed jury instruction informing the jury that a mere buyer-seller relationship between Honken and others was not sufficient to show that Honken managed or supervised these individuals. We disagree. The district court's instructions informed the jury that the prosecution was required to prove "that Dustin Honken exerted some type of influence over five or more other persons, as shown by these individuals' compliance with his directions, instructions, or terms for performing the activities of the CCE." We believe that these instructions adequately stated the law, as they largely tracked our description of the management element in Possick. 849 F.2d at 336. Moreover, the instructions gave Johnson room to argue that a mere buyer-seller relationship between Honken and others would be insufficient to make Honken a manager or supervisor over these individuals.[19]

Johnson also alleges various defects in the instructions relating to the predicate CCE offenses. Her principal complaint is that the articulation of several of these offenses, which tracks the language of the indictment, is so vague that it violated her right to a unanimous verdict on the predicate offenses underlying the CCE. The

_____

[19]It bears mention that a buyer-seller instruction based on Prieskorn, 658 F.2d at 636, was not warranted in this case because the drug relationship between Honken and the two dealers involved multiple transactions and large quantities of drugs rather than a single transaction involving an amount consistent with personal use. See United States v. Cordova, 157 F.3d 587, 597 (8th Cir. 1998) (buyer-seller instruction properly rejected in a conspiracy case where there was a large quantity of drugs and a significant amount of interaction between defendants and dealers over an extended period of time).

district court concluded that all of her complaints about the instructions as they pertain to the CCE predicates essentially reiterate objections to the indictment that it had already deemed waived as untimely. Johnson, 403 F. Supp. 2d at 837. In any case, the instructions provide that each predicate offense must be found unanimously.

Johnson appears to be contending that because several of the offenses were alleged to have occurred on unknown dates over an extended period of time, the jurors may have reached different conclusions regarding some of the facts underlying these offenses. Jurors may, however, differ on such "underlying brute facts" as long as they attain unanimity that a particular predicate offense occurred. Cf. Richardson v. United States, 526 U.S. 813, 817 (1999) (noting the distinction between elements of the offense and the underlying facts of the offense). In a trial for a crime requiring the threat of force, for example, jurors could differ on whether a defendant used a knife or a firearm so long as they reached unanimity that the required element had been met. Id. Finally, even if the first seven alleged predicates about which Johnson complains were defective, the jury found five other offenses, thus rendering harmless any error.

We have considered Johnson's other allegations regarding the merits-phase jury instructions and conclude that they lack merit.

13.  Johnson's eligibility for the death penalty

Johnson contends that she was not eligible for the death penalty for the murders of Lori Duncan or DeGeus because there was insufficient evidence that she personally committed the murders in a manner that involved torture or serious physical abuse.[20] She also contends that she was not eligible for the death penalty for Lori Duncan's

_____

[20]One of the statutory aggravating factors the jury considered in the eligibility phase was whether "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim."  21 U.S.C. § 848(n)(12) (2005).

murder because the evidence was insufficient to demonstrate that Lori Duncan's murder involved torture or serious physical abuse.

Johnson does not challenge on appeal the instructions the district court gave on the statutory aggravating factors, and she provides no authority for her suggestion that this aggravating factor required her to personally commit the murders. The instructions required the jury to find that Johnson "committed the offense in question in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim." Although Johnson may not have pulled the trigger, the jury was warranted in concluding that her conduct "involved" the "torture or serious physical abuse" required to find this enhancement.[21] As for Lori Duncan's murder specifically, in addition to the "prolonged mental harm"[22] that this young mother undoubtably suffered as she and her children were forcibly taken from their home, there was evidence that she had been bound and gagged, had suffered fractures to her pelvic bone and left hand, and had suffered at least one gunshot wound more than necessary to end her life. The evidence thus establishes both torture and serious physical abuse.

---

[21]We note that although there was little evidence that Johnson had directly inflicted any serious physical abuse upon DeGeus, there was testimony that she had aimed the firearm at him while Honken beat him. Accordingly, there was evidence that Johnson not only assisted with the murder, but participated in the serious physical abuse inflicted upon DeGeus as well.

[22]The jury was instructed that "torture" includes "prolonged mental harm caused by . . . the threat that another person will be imminently subjected to death, or severe physical pain or suffering." (Eligibility-phase instruction No. 4).

14.	Admission of Steven Vest's testimony

During the selection phase, the district court allowed Steven Vest, who had been incarcerated with Honken, to testify to statements that Honken had made to Vest about the murders. Johnson argues that the admission of Vest's testimony violated her rights under the Confrontation Clause, that his statements were constitutionally unreliable, and that the probative value of Vest's testimony was outweighed by its potential for unfair prejudice. We disagree.

First, the admission of Vest's statements did not violate Johnson's confrontation rights. The Confrontation Clause bars the "'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" Davis v. Washington, 126 S. Ct. 2266, 2273 (2006) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)). Only testimonial statements implicate a defendant's confrontation rights. Crawford, 541 U.S. at 53-54. Testimonial statements typically include "'solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact.'" Crawford, 541 U.S. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). Although the Supreme Court has not provided a comprehensive definition of the phrase "testimonial," and the outer boundaries of the term have yet to be established, we conclude that Honken's remarks fall safely outside the scope of testimonial hearsay. Honken was not making "formal statement[s]." Id. at 51. Nor were his statements elicited in response to government interrogation whose primary purpose was to establish facts potentially relevant to a criminal prosecution. See Davis, 126 S. Ct. at 2273-74 (describing testimonial statements made during the course of a police interrogation). In other words, when Honken spoke with Vest he did not "bear testimony," Crawford, 541 U.S. at 51 (citation and quotation marks

omitted), in any relevant sense of the term, and the admission of his statements, through Vest's testimony, did not violate Johnson's confrontation rights.[23]

Second, we do not agree that Vest's testimony was so unreliable that its admission violated Johnson's due process rights. "Due process requires that some minimal indicia of reliability accompany a hearsay statement." United States v. Petty, 982 F.2d 1365, 1369 (9th Cir. 1993). We believe that the testimony met the requisite threshold of reliability. Honken's statements were against his penal interests, his comments dealt primarily with his involvement in the murders rather than Johnson's, and his remarks harmonized with other evidence in the case. Finally, because Johnson put the extent of her involvement in the murders in question, we conclude that this testimony was more probative than prejudicial.

15.    The recitation of a poem during the selection phase

Johnson contends that Lori Duncan's brother, Robert Milbrath, should not have been permitted to read during the selection phase[24] a short poem written by one of

---

[23]The parties sharply dispute whether the Confrontation Clause was applicable to Johnson's selection phase. As the government observes, we have held in the context of a non-capital case that "the confrontation clause does not apply in sentencing proceedings." United States v. Wallace, 408 F.3d 1046, 1048 (8th Cir. 2005) (per curiam), cert. denied, 546 U.S. 1069 (2005). Johnson argues that capital sentencing is different and that a broader range of constitutional rights – including confrontation rights – apply in capital sentencing proceedings. We need not address this issue, however, because the statements fall outside the scope of the Confrontation Clause.

[24]As we noted earlier, after the jury found Johnson guilty of the murders, there was an eligibility phase, in which the jury was asked to determine whether Johnson was eligible for the death penalty, followed by a selection phase, in which the jury was asked to determine whether Johnson was to receive on the various charges a death sentence or a sentence of life in prison. In the selection phase, the parties presented

-35-

Amber Duncan's childhood friends.[25]  The government may introduce victim-impact evidence during the penalty phase of a capital trial to demonstrate the "specific harm caused by the defendant," including evidence that shows that the "victim is an individual whose death represents a unique loss to society and in particular to his family." Payne v. Tennessee, 501 U.S. 808, 825 (1991) (citation and quotation marks omitted).  The introduction of evidence describing the emotional loss to the victim's family will violate a defendant's due process rights if "the victim impact evidence introduced is 'so unduly prejudicial that it renders the trial fundamentally unfair.'" Nelson, 347 F.3d at 713 (quoting Payne, 501 U.S. at 825).

Johnson asserts that the poem was more appropriate to a funeral than a murder trial, but she does not appear to argue that the sentiments and emotions articulated by the poem were themselves unduly prejudicial or that their impact was somehow magnified by the fact that they were expressed through poetry.  Although Milbrath's tearful and emotional reading of the poem was apparently very moving, it merely conveyed the devastation and loss felt by Milbrath and the poem's author.  In addition, the government presented only six family members to offer victim-impact testimony, the testimony lasted less than two hours, and Johnson's own selection-phase evidence featured more witnesses and took twice as many trial days.  The fact that the government did not present an undue amount of victim-impact evidence and that Johnson presented significant mitigation evidence, lessened any potential for undue prejudice the poem may have had.  See Nelson, 347 F.3d at 713-14 (noting that the

---

evidence and argument concerning aggravating factors that had not been considered during the eligibility phase and on mitigating factors.

[25]The poem reads as follows:  "She was only six when she left on a picnic.  Then the theft.  She never would be able to get to the age of seven, for she was shot, sent to heaven.  I never got to say good-bye.  The nights I was scared, those nights I'd cry wishing to see her face again, wishing that it would have never been.  For my dear friend, I loved her so.  I never wanted her to go.  Only five and not aware of what would be ahead.  Oh, what a scare.  Amber isn't just a color.  She was my best friend."

government presented only six victim-impact witnesses, that its presentation occupied only 101 of 1100 pages of trial transcript, and that the defendant was able to present a substantial amount of mitigation evidence).

16.    The selection-phase verdict forms

Johnson alleges that the verdict forms were erroneous and fatally defective because they required the jury to either unanimously agree to a death sentence or unanimously agree to a life sentence, whereas the law provides that a life sentence will be imposed if any juror votes for life. She also argues that the verdict forms contradict the district court's accurate jury instructions on this topic. Because Johnson did not object to the forms, we review them for plain error. United States v. Martinson, 419 F.3d 749, 753-54 (8th Cir. 2005).

The verdict forms do not expressly mention unanimity with respect to the final verdict. Instead, the forms refer the jurors to two of the district court's final selection-phase instructions, one of which states that if any one juror finds that death is not justified for a particular count, the court will impose a sentence of life imprisonment without the possibility of parole on that count. Two other instructions given to the jury — but not referenced on the verdict form themselves — convey the same information. The jurors were thus correctly informed that unanimity was required for a death sentence, but not for a sentence imposing life in prison. There was no plain error.

17.    The government's selection-phase closing argument

Johnson contends that one of the prosecutors made several improper comments during the selection-phase closing arguments. She argues that the prosecutor mischaracterized the law pertaining to mitigating factors, that he improperly attempted to minimize the jurors' sense of responsibility for deciding Johnson's fate, that he took

improper advantage of the jurors' sympathy for the victims, and that he denigrated the mitigating factor regarding the victims' consent to the course of conduct resulting in their deaths. Because Johnson raised a contemporaneous objection to only one of the comments, we will review the majority of the assertedly improper remarks for plain error and "we will only reverse under exceptional circumstances." United States v. Mullins, 446 F.3d 750, 758 (8th Cir. 2006) (quoting United States v. Eldridge, 984 F.2d 943, 947 (8th Cir. 1993)). Because Johnson did object to the prosecutor's comments about the "victims' consent" mitigator, we will review for abuse of discretion the district court's denial of Johnson's objection to the prosecutor's remarks on that subject. United States v. Samples, 456 F.3d 875, 886 (8th Cir. 2006), *cert. denied*, 127 S. Ct. 1162 (2007). Our inquiry turns on whether the prosecutor's remarks were improper and, if they were, whether the remarks so "infected the trial with unfairness as to make the resulting [death sentences] a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

Johnson's first contention concerns the prosecutor's remarks about Johnson's mitigators. The prosecutor argued:

> The intentional murder of children is an unspeakable evil. It's an evil that cannot be mitigated by any evidence. None of the defendant's mitigators can take away what she did and her involvement in killing those children. Somebody involved in the murder of children deserves the death penalty.

Johnson suggests that the prosecutor was improperly arguing that "mitigating factors did not apply in this context." We disagree. The prosecutor was not arguing that the jurors could choose to ignore the mitigators or exclude them from consideration, but rather that they were insufficient to outweigh the gravity of the offense. As we have already noted, as long as the jurors are not told to ignore or

-38-

disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight.[26]

Johnson also takes issue with the prosecutor's suggestion that by raising her troubled childhood as a mitigating factor, Johnson was attempting to excuse her conduct. Johnson appears to assert that the prosecutor was arguing that Johnson's references to her childhood were an attempt to deny criminal responsibility. We disagree. The prosecutor was arguing instead that she had free will and an opportunity to make the right choices, her difficult childhood notwithstanding. This was permissible. Cf. Bland v. Sirmons, 459 F.3d 999, 1026 (10th Cir. 2006) (holding that prosecutor's reference to some of defendant's mitigators as "excuses" was not misconduct), *cert. denied*, 127 S. Ct. 2117 (2007).

Johnson asserts next that the prosecutor diminished the jurors' sense of responsibility for the verdict by stating, "And if you choose the death penalty, you

---

[26] We do note, however, that the prosecutor's choice of words was infelicitous. While he had probably meant to argue only that Johnson's mitigators did not outweigh the heinousness of the children's murders, his remarks, if they were taken out of context, could be taken to suggest that the mitigation evidence was intended to diminish the horror of the killings or Johnson's involvement therein. At least some of the mitigating factors, however, such as Johnson's relationship with her daughters or her potential for leading a productive life in prison, were intended to provide reasons for mercy despite the gravity of the offense, rather than to "take away" Johnson's involvement in the crime or portray the murders as any less evil. "'The question is not whether evidence in mitigation makes the defendant any less guilty, or the crime any less horrible, but whether it provides a reason why, despite those things, the defendant should not die.'" Le v. Mullin, 311 F.3d 1002, 1017 (10th Cir. 2002) (per curiam) (quoting Le v. Oklahoma, 947 P.2d 535, 555 (Okla. Crim. App. 1997)). Although the prosecutor's comments may have been somewhat imprecise, we do not believe that the comments, taken in their full context, were likely to confuse the jury – particularly in light of the fact that Johnson's counsel reminded them that the nature of the crime was only one consideration in determining the penalty and that they were to consider the offender as well as the offense.

choose it as a group. It doesn't rest on the shoulders of any one of you." He also remarked that "[t]here's courage in numbers." These comments were not improper. While "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere," such as an appellate court, Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985), that was not what the prosecutor was doing here. The prosecutor was instead reposing the responsibility upon the jury, where it belonged. Furthermore, while the prosecutor emphasized the collective nature of jury deliberations and the fact that a verdict of death could not be returned unless the jury as a whole determined that it was appropriate, the prosecutor also acknowledged that the decision to vote for death would also have to be made by the jurors individually.

Johnson argues further that the prosecutor improperly encouraged the jury to impose the death penalty based on sympathy for the victims. During closing arguments, Johnson's counsel attempted to underscore the gravity of a life sentence, essentially contending that Johnson had a long time left to live and that with each passing year Johnson would miss various milestones and events in the life of her family, knowing that she had only herself to blame. The prosecutor responded to this argument during rebuttal by remarking that ten, twenty, and thirty years from now, the victims would still be dead and Kandi and Amber would still be ten and six-years old. The prosecutor also added, "No matter how small Angela Johnson's cell may be, it's going to be larger than the coffin that Amber and Kandi Duncan are laying [*sic*] in now." These remarks strayed over the line. Although the government was entitled to respond to Johnson's portrait of a miserable thirty years behind bars, it should not have used the victims' plights to do so. See Bland, 459 F.3d at 1028 ("[I]t is prosecutorial misconduct for the prosecution to compare the plight of [a murder] victim with the life of the defendant in prison."). As Johnson notes, the prosecutor's comments closely resemble remarks the Tenth Circuit criticized in Le, 311 F.3d at 1014-15. In that case, the prosecutor stated that the following year the defendant

-40-

would be one year older, but the victim would remain "34 years old from now until eternity. He will always be 34." Id. Later, the prosecutor said, "Defense counsel has asked you to sentence [sic] a punishment of life imprisonment or life without parole, but do you really think that justice would be done if this man goes to prison, gets three meals a day and a clean bed every night and regular visits from his family while Hai Nguyen lays cold in his grave[?]" Id. at 1015. The prosecutor's comments in this case, like those in Le, went beyond the bounds of permissible argument. Nevertheless, because the senseless and unspeakably brutal deaths of the two small children would naturally and inevitably evoke deep sympathy from the jury, those brief comments were not likely to evoke to any further appreciable degree the jury's sympathy for the victims. See Walker v. Gibson, 228 F.3d 1217, 1243 (10th Cir. 2000) (concluding that although the prosecutor encouraged the jury to base its decision on sympathy for the victim, sympathy would have been engendered by the nature of the crime, even without the prosecutor's unfortunate remarks). We therefore conclude that the remarks, while questionable, did not infect the selection phase of Johnson's trial with unfairness and were not significant enough to constitute plain error.

Finally, Johnson argues that the prosecutor improperly "denigrated" the mitigating factor associated with the victims' consent. This mitigating factor required the jury to determine whether "two victims, Greg Nicholson and Terry DeGeus, consented to the conduct, methamphetamine manufacturing and distribution, that significantly contributed to the circumstances of their deaths." The prosecutor argued that, through this mitigating factor, Johnson was essentially attempting to blame Nicholson and DeGeus for their demise and contended, "They were murdered because they were witnesses, not because they were involved in the drug trade." The prosecutor thus did not "denigrate" the mitigator, but in essence merely contended that Nicholson's and DeGeus's participation in the drug trade did not significantly

-41-

contribute to the circumstances of their deaths. In light of the evidence, we cannot say that this was an unfair argument.[27]

18.    Multiplicitous convictions

Johnson contends that her convictions for murder while engaging in a conspiracy and her convictions for murder while working in furtherance of a CCE were mutliplicitous. The Supreme Court held in Rutledge v. United States, 517 U.S. 292 (1996), that because a drug conspiracy violation of 21 U.S.C. § 846 is a lesser included offense of a CCE violation of 21 U.S.C. § 848, a defendant may not be convicted of both offenses. Id. at 306-07. Johnson's convictions for the conspiracy murders and her convictions for the CCE murders are therefore multiplicitous. See United States v. Moore, 149 F.3d 773, 779 (8th Cir. 1998) (noting that the defendant could not be convicted of both conspiracy and CCE murder, but holding that the risk of multiplicitous convictions or punishment was eliminated by a verdict form instructing the jury that they need not consider conspiracy murder charges if they found the defendant guilty of CCE murder). The government does not contest the multiplicitous nature of the charges, arguing instead that Johnson had waived the claim by not raising it in the district court. Because we conclude that the claim was raised sufficiently below and the government has not given us any reason to conclude that the charges were not multiplicitous (as they appear to be), we remand this case so the district court may vacate the conspiracy murder convictions. Cf. Possick, 849

---

[27]There is very little case law interpreting this mitigator. The case most directly on point is United States v. Beckford, 962 F. Supp. 804 (E.D. Va. 1997), which, after noting the paucity of federal law or legislative history on this mitigator, surveys relevant state law and the pertinent section of the Model Penal Code. Id. at 817-21. Based on this survey, the district court in Beckford concluded that the victim's consent mitigator will usually be relevant in two circumstances: 1) when the defendant and the victim have consented to participate in a highly dangerous activity, such as Russian roulette; or 2) where the victim consents to a mercy killing. Id. at 821.

F.2d at 341(remanding the case to the district court so that it may vacate conspiracy conviction that was a lesser included offense in the CCE conviction).

19.    Juror misconduct

Johnson's final claim is that the district court erred in denying her motion for an evidentiary hearing to explore potential juror misconduct. After the trial, Johnson's attorneys were granted leave to contact the jurors "subject to the limits of Rule 606(b) of the Federal Rules of Evidence" and with the understanding that the purpose of contacting the jurors was to help the attorneys try a better case. One of the jurors interviewed by a defense investigator told the investigator that he had visited his son in prison a week before the penalty-phase closing arguments and that he was advised that prisoners serving life sentences are allowed in the general population, whereas those facing the death penalty are kept in solitary confinement. There is no indication that he told the other jurors what he had learned. The juror also said that he had explained to other jurors that Johnson would have three automatic appeals and that the jury's verdict would merely "set the stage" for these appeals. The district court denied Johnson's request for an evidentiary hearing to explore these matters further.

"The district court has broad discretion in managing juror misconduct allegations, and its decision whether to conduct an evidentiary hearing over such allegations will be affirmed absent an abuse of discretion." United States v. Wintermute, 443 F.3d 993, 1002 (8th Cir. 2006) (citing United States v. Vig, 167 F.3d 443, 450 (8th Cir. 1999)). Federal Rule of Evidence 606(b) generally precludes inquiry into intrajury communications. United States v. Caldwell, 83 F.3d 954, 956 (8th Cir. 1996). The two exceptions to the rule permit testimony regarding "extraneous prejudicial information and outside influences brought to bear on the jury." Id. Before a hearing may be granted, however, the moving party should "show[] that outside contact with the jury presents a reasonable possibility of

-43-

prejudice to the verdict." United States v. Tucker, 137 F.3d 1016, 1030 (8th Cir. 1998).

We conclude that the district court's decision to deny a hearing to explore the juror's prison visit was not an abuse of discretion because we are not persuaded that there was a reasonable possibility that information pertaining to prison conditions for death row or life-in-prison inmates would have affected the jurors' deliberations or prejudiced Johnson's case. Indeed, as the district court noted, Johnson herself introduced evidence pertaining to prison conditions. Johnson, 403 F. Supp. 2d at 887.

We also conclude that inquiry into the remarks concerning Johnson's "automatic" appeals is precluded by Rule 606(b) because, contrary to Johnson's suggestion, the juror's comments were not extraneous information, but merely reflected the juror's understanding of the appellate process, a topic within the range of jurors' common knowledge. Johnson correctly observes that information may be considered extraneous even if it originates with a juror. United States v. Swinton, 75 F.3d 374, 381 (8th Cir. 1996). We have also recognized, however, that "jurors are expected to bring commonly known facts to bear in assessing the facts presented for their consideration." Id.; see also Hard v. Burlington Northern R.R. Co., 870 F.2d 1454, 1461 (9th Cir. 1989) ("The type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings, and bias that every juror carries into the jury room."). Just as jurors may be expected to have opinions (sometimes accurate; sometimes poorly conceived) on matters pertaining to everyday life, so too may they be expected to possess some notions regarding the criminal justice system. Most, if not all, of the jurors in Johnson's case might be expected to have acquired some impressions regarding the appellate process. These impressions may be incorrect and taking such opinions into account may even, in some circumstances, be improper, but they are not extraneous. See United States v. Rodriquez, 116 F.3d 1225, 1226-27 (8th Cir. 1997) (noting that although it was improper for the jury to draw adverse inferences from the

fact that the defendant did not testify, an evidentiary hearing to inquire into this misconduct was properly denied because the defendant's failure to testify was not extraneous information). We therefore conclude that the district court did not abuse its discretion in precluding further examination of the juror's ill-advised remarks to his fellow jurors.

After careful consideration of the record, the parties' arguments, and the district court's most thorough memorandum opinion, we conclude that Johnson's remaining arguments are unavailing. The case is remanded to the district court so that the court may vacate Johnson's multiplicitous convictions and sentences. In all other respects, we affirm.

_____