# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3264

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Robert L. Bolden, Sr., | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: June 9, 2008
Filed: November 4, 2008 (Corrected: 11/11/08)
(Corrected: 11/13/08)

_____

Before LOKEN, Chief Judge, EBEL[*] and COLLOTON, Circuit Judges.

_____

LOKEN, Chief Judge.

Robert Bolden murdered security guard Nathan Ley outside a St. Louis bank during an attempted robbery. After a month-long trial, a federal jury convicted Bolden of killing Ley with a firearm during an attempted bank robbery, conspiracy to commit bank robbery, and being a felon-in-possession of a firearm. The jury sentenced him to death for the bank robbery-murder and firearm offenses. See 18

_____

[*]The HONORABLE DAVID M. EBEL, United States Circuit Judge for the Tenth Circuit, sitting by designation.

U.S.C. §§ 2113(e), 924(j)(1). Bolden appeals, arguing the district court[1] committed some thirty reversible errors prior to and during trial. We will first address the three issues emphasized at oral argument. After careful review of the record, we affirm.

## I. Background

Dominick Price testified that, on the morning of October 7, 2002, Bolden asked Price to help rob a Bank of America branch because Bolden needed $2,000 to avoid being evicted from his home. As the two "cased" the bank, Bolden told a hesitant Price his plan: Bolden would brandish his handgun and disarm the guard outside the bank, then Bolden and Price would take the guard into the bank as a hostage, demand money, and drive away in Bolden's car. The two men purchased nylon stocking caps, and Bolden recruited a third man, Corteze Edwards, to assist in the robbery.

Early that afternoon, the trio dressed in dark clothing and drove to a parking lot near the bank. Price and Edwards wore masks. Bolden did not. When bank guard Ley walked out of the bank, Bolden approached on foot, with Price and Edwards fifteen-to-twenty feet behind. Price testified that Bolden stopped a short distance from Ley and pointed his handgun at the guard. After a brief dialog, Ley reached for the gun, and they struggled. Bolden regained control of the gun and shot Ley in the jaw. As Ley fell, Bolden took a step back and fired another shot into Ley's head. Ley died from the second wound later that afternoon. The three robbers ran off, shedding clothing as they ran. Many bystanders witnessed the shooting. One saw Bolden drive away, and he was arrested that evening. Clothing found near the bank tested positive for traces of DNA from Bolden, Price, and Edwards. A later search of Bolden's home uncovered the handgun used to kill Ley and ammunition matching that found during Ley's autopsy.

---

[1]The HONORABLE CAROL E. JACKSON, Chief Judge of the United States District Court for the Eastern District of Missouri.

## II. A <u>Batson</u> Challenge

Before trial, the government used a peremptory challenge to strike prospective juror number 44, an African American woman. Bolden argued the strike violated <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), which held that it is a violation of the Equal Protection Clause for the government to use a peremptory challenge to strike a prospective juror solely on the basis of race. After the district court ruled that Bolden established a prima facie case of discrimination, the government claimed that it struck juror 44 for a race-neutral ground -- because, when asked to elaborate on her questionnaire response that the criminal justice system should use legal students for research, she explained that she believed based on twelve years of legal training that using legal students for research would assist the criminal justice system. The government expressed concern that she might give more weight to her legal training than is warranted and that there was no way to know how this experience might affect the deliberation process.[2]

The district court found that this was a race-neutral reason, comparing the strike of juror 44 with the government's strike of juror 142, a white high school teacher who said he often discussed constitutional law issues with his students. The court rejected Bolden's assertion that juror 44 should be compared with non-stricken white juror 176, a deputy clerk for a Missouri court who stated in her questionnaire that her "passion is to see criminals convicted," and that she has a favorable view of the court system based upon her son's fair treatment for pending drug related charges. The court's ultimate finding was that Bolden failed to prove that the strike of juror 44 was motivated by race discrimination.

---

[2]The government also claimed that an Assistant United States Attorney may have offended juror 44 when he addressed her by the wrong name. The district court did not credit this reason.

On appeal, Bolden argues the district court clearly erred when it denied his Batson challenge because the government's purported race-neutral reason for striking juror 44 was implausible. We review the court's Batson rulings for clear error, keeping in mind that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from the party opposing the strike." Purkett v. Elem, 514 U.S. 765, 768 (1995); see Snyder v. Louisiana, 128 S. Ct. 1203, 1208 (2008). After careful review of the questionnaire responses and voir dire testimony, and giving the district court's findings the "great deference" Batson requires, 476 U.S. at 98 n.21, we conclude that the district court did not clearly err in finding that the government stated a race-neutral reason for striking juror 44 that was adequately supported by the record. Compare United States v. Ortiz, 315 F.3d 873, 896-97 (8th Cir. 2002), cert. denied, 540 U.S. 1073 (2003).

## III. Statutory Aggravating Factors

The Federal Death Penalty Act of 1994 ("FDPA") provides that, if the defendant has been found guilty of a homicide offense for which the death penalty may be imposed, the trial judge "shall conduct a separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C. § 3593(b). At this hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor," regardless of its admissibility under the Federal Rules of Evidence. § 3593(c). The jury must find beyond a reasonable doubt at least one of sixteen "aggravating factors" before it may impose the death penalty; the government has the burden of proving "any aggravating factor . . . beyond a reasonable doubt." Id. The defendant has the burden of proving "any mitigating factor . . . by a preponderance of the evidence." Id. The jury then considers "all the information received during the hearing," and returns "special findings" identifying the statutory and non-statutory aggravating factors it has unanimously found to exist, and the mitigating factors that one or more jurors have found to exist. If no statutory aggravating factor is found beyond a reasonable doubt, "the court shall impose a

-4-

sentence other than death." § 3593(d). If the jury instead finds the requisite mental state and one or more statutory aggravating factors, then it "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" and, based upon this consideration, recommend by unanimous vote "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." § 3593(e).

Bolden's superseding indictment alleged and the jury found two aggravating factors, "pecuniary gain" and "conviction for two felony drug offenses." See §§ 3592(c)(8), (10). Bolden challenges those findings on multiple grounds.[3]

**A. Pecuniary Gain.** Committing a homicide "as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value" is an aggravating factor. 18 U.S.C. § 3592(c)(8). In this case, the district court instructed the jury only on the second clause  -- the government must prove that Bolden "committed the killing or murder in the expectation of anything in the form of money, property, or anything else having some economic value, benefit or advantage." Emphasizing the first clause, Bolden argues that the pecuniary gain factor only applies to a murder-for-hire. He urges us to read subsection (c)(8) in tandem with subsection (c)(7), which applies to a defendant who "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value."

---

[3]Bolden also argues that the district court should have dismissed the indictment because the government misled the grand jury concerning the evidence of these aggravating factors. We disagree. This allegation of prosecutorial misconduct during the grand jury proceedings was rendered harmless beyond a reasonable doubt by the petit jury's guilty verdict. United States v. Sanders, 341 F.3d 809, 818-19 (8th Cir. 2003), cert. denied, 540 U.S. 1227 (2004).

Bolden did not raise this issue in the district court, so our review is for plain error. At least five other circuits agree that § 3592(c)(8) applies, not only to murder-for-hire, but also when the murder itself, and not just an underlying offense such as robbery, was committed with the expectation of pecuniary gain. As the Eleventh Circuit explained, "The 'consideration' and 'expectation' clauses are two separate ways by which the pecuniary gain factor may be satisfied, and they both must have meaning." United States v. Brown, 441 F.3d 1330, 1370 (11th Cir. 2006), cert. denied, 127 S. Ct. 1149 (2007); accord United States v. Mitchell, 502 F.3d 931, 974-75 (9th Cir. 2007), cert. denied, 128 S. Ct. 2902 (2008); United States v. Barnette, 390 F.3d 775, 784-85 (4th Cir. 2004), vacated on other grounds, 546 U.S. 803 (2005); United States v. Bernard, 299 F.3d 467, 483-84 (5th Cir. 2002), cert. denied, 539 U.S. 928 (2003); United States v. Chanthadara, 230 F.3d 1237, 1263-64 (10th Cir. 2000), cert. denied, 534 U.S. 992 (2001). Though we have never addressed the issue, our prior decisions are consistent with these cases. See United States v. Paul, 217 F.3d 989, 995 n.2, 1001 (8th Cir. 2000), cert. denied, 534 U.S. 829 (2001). There was no plain error.

Bolden next contends that, even if § 3592(c)(8) may apply to some bank robbers, there was insufficient evidence that he killed Ley in the expectation of pecuniary gain, rather than to eliminate an eyewitness and to escape from a botched robbery. In reviewing the sufficiency of the evidence supporting an aggravating factor, we "consider whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." Ortiz, 315 F.3d at 902.

We agree with Bolden that the pecuniary gain factor applies to a killing during the course of a bank robbery only "where pecuniary gain is expected to follow as a direct result of the murder." Bernard, 299 F.3d at 483; see Mitchell, 502 F.3d at 975; Brown, 441 F.3d at 1370-71. Bolden relies heavily on Bernard, but in that case defendants killed the victims after a completed robbery and carjacking solely to eliminate them as witnesses. 299 F.3d at 472-73, 483-84. Here, by contrast, Bolden

brought a loaded handgun to the bank planning to confront the bank guard before robbing the bank. Price testified that, when he and Bolden returned to his house after the failed robbery, Bolden "was mad that . . . we didn't complete the bank robbery," said "that the guard was stupid," and referred to the event as a "wasted trip." These statements were sufficient to permit a reasonable jury to find that Bolden shot Ley to remove an obstacle to completing the robbery and that his intention was to continue with the robbery once Ley had been removed. Thus, the killing was committed in the expectation of receiving pecuniary gain. 18 U.S.C. § 3592(c)(8). Bolden also told Price, "it was either shoot the guard or spend the rest of his life in jail." But the statute does not require that pecuniary gain be the only motive for a murder.

Finally, Bolden argues that the pecuniary gain instruction allowed the jury to find this factor based solely on his motive for the underlying robbery because the district court refused to charge that pecuniary gain "was expected to follow as a direct result of the murder." The court instead instructed:

> To establish that a defendant committed the killing or murder in the expectation of the receipt of anything of pecuniary value, the government must prove that the defendant committed the killing or murder in the expectation of anything in the form of money, property, or anything else having some economic value, benefit or advantage.

This instruction accurately stated the law. Moreover, by substituting "the killing or murder" for the reference to "the offense" in § 3592(c)(8), the instruction made clear that the jury could not find this aggravating factor based solely on Bolden's attempt to rob the bank for pecuniary gain. See Chanthadara, 230 F.3d at 1263-64. The district court did not abuse its wide discretion in formulating this instruction. See United States v. Phelps, 168 F.3d 1048, 1057 (8th Cir. 1999) (standard of review).

**B. Prior Drug Distribution Offenses.** The jury also found a second statutory aggravating factor, that Bolden was previously convicted of two or more felony

offenses "committed on different occasions, involving the distribution of a controlled substance." § 3592(c)(10). Bolden concedes that the government established one prior offense, a 1995 Michigan conviction for delivery of cocaine. But he contends that the second offense on which the government relied, a 1993 Michigan conviction for "attempted possession with intent to deliver cocaine," was not an offense "involving the distribution of a controlled substance." He argues, without citation to case law or legislative history, that "Congress did not use the term 'involving' to encompass convictions based on mere 'attempts' or 'intents.'" The government responds that the term, "offenses . . . involving distribution," is not limited to actual distribution offenses; it should be read to include offenses where drug distribution was attempted but thwarted by police intervention. In this case, for example, the government introduced the transcript of Bolden's 1993 guilty plea hearing at which he expressly admitted that he had intended to sell at least some of the crack cocaine found in his possession.

Reviewing the district court's interpretation of statutory aggravating factors *de novo*, we agree with the government. See <u>United States v. Allen</u>, 247 F.3d 741, 786 (8th Cir. 2001) (standard of review), <u>vacated and remanded on other grounds</u>, 536 U.S. 953 (2002), <u>decision on remand</u>, 406 F.3d 940 (8th Cir. 2005) (en banc). We construed the statutory term, "involving the distribution . . . of any controlled substance," in a former version of 18 U.S.C. § 924(c)(2) "as including more than the crime[] of distribution." <u>United States v. Matra</u>, 841 F.2d 837, 843 (8th Cir. 1988). Supporting that interpretation, the Supreme Court recently observed in construing 18 U.S.C. § 924(e)(2)(B), "An unsuccessful attempt to blow up a government building . . . would 'involv[e] [the] use of explosives.'" <u>James v. United States</u>, 127 S. Ct. 1586, 1592 (2007). Likewise, we conclude, the term "involving the distribution of a controlled substance" in § 3592(c)(10) includes attempt offenses. Bolden's contention that the word "involving" in § 3592(c)(10) should be construed as excluding attempt

offenses because the aggravating factors in §§ 3592(c)(2) and (4) expressly include attempt offenses is unpersuasive.[4]

Bolden further argues that the district court abused its discretion in admitting testimony by a Michigan police officer detailing suspected drug trafficking activity that preceded Bolden's 1993 arrest and conviction for "attempted possession with intent to distribute cocaine." Bolden argues this permitted the jury to find the § 3592(c)(10) factor based upon uncharged conduct. (He does not argue that the evidence was insufficient to support this finding or that the court erred in instructing the jury.) The FDPA "erects very low barriers to the admission of evidence at capital sentencing hearings." United States v. Lee, 274 F.3d 485, 494 (8th Cir. 2001), cert. denied, 537 U.S. 1000 (2002).[5] Such a rule is necessary to ensure that the death penalty phase produces "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." Zant v. Stephens, 462 U.S. 862, 879 (1983) (emphasis in original). There was no abuse of discretion in admitting this evidence.

Finally, Bolden argues that § 3592(c)(10) is unconstitutional as applied in this case because prior remote nonviolent drug offenses do not rationally narrow the class of death-eligible defendants, as required by Zant, 462 U.S. at 877 & n.15. We disagree. Bolden cites no case in which a court invalidated a death-eligibility factor because it failed to identify prior conduct of sufficient gravity. In Allen, 247 F.3d at

---

[4]The James Court construed "involves use of explosives" in § 924(e)(2)(B)(ii) as including the crime of attempt even though § 924(e)(2)(B)(i), the immediately preceding subsection, expressly includes prior attempt convictions.

[5]18 U.S.C. § 3593(c) provides: "[I]nformation may be presented as to any matter relevant to the sentence . . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."

761, we held that the FDPA statutory factors "adequately narrow[] the class of persons eligible for the death penalty," observing that "how broadly or how narrowly the death penalty should be applied as a punishment, if at all, is essentially a political choice left to the people's elected representatives in the legislative and executive branches." Congress has repeatedly enacted severe sentencing enhancements for recidivist drug traffickers. See 21 U.S.C. § 841(b). We conclude that § 3592(c)(10) identifies circumstances that reasonably justify imposition of a more severe sentence for murder.[6]

## IV. Penalty Phase Bifurcation

As the plain language of §§ 3593(b)-(e) summarized at the start of Part III makes clear, the FDPA contemplates a single penalty phase hearing at which all relevant evidence is admitted and, if the defendant is found eligible for the death penalty, ultimately weighed by the jury. A number of district courts have nonetheless granted pre-hearing motions to bifurcate the penalty phase (or, as some have phrased it, "trifurcate" the entire trial) into an "eligibility phase," limited to evidence relevant to mental state and to the existence of one or more statutory aggravating factors, and, if the defendant is found eligible, a "selection phase," at which evidence relevant to mitigating factors and non-statutory aggravating factors such as victim impact and other crimes is received and weighed by the jury. See, e.g., United States v. Natson, 444 F. Supp. 2d 1296, 1309 (M.D. Ga. 2006); United States v. Mayhew, 380 F. Supp.

---

[6]Even if the finding of the § 3592(c)(10) aggravating factor was not sustained, only one statutory aggravating factor need be found. § 3593(d). We may not "reverse or vacate a sentence of death on account of . . . any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." § 3595(c)(2). As the evidence relevant to the Michigan drug convictions was admissible in any event and the jury could have given this evidence aggravating weight under the non-statutory aggravating factor "other criminal conduct," any error in submitting this statutory factor was harmless beyond a reasonable doubt. See Brown v. Sanders, 546 U.S. 212, 220 (2006).

-10-

2d 936, 955-57 (S.D. Oh. 2005); United States v. Johnson, 362 F. Supp. 2d 1043, 1099-1111 (N.D. Ia. 2005) (tried under 21 U.S.C. § 848, not the FDPA), aff'd (without discussing this issue), 495 F.3d 951 (8th Cir. 2007); United States v. Jordan, 357 F. Supp. 2d 889, 903-04 (E.D.Va. 2005); United States v. Davis, 912 F. Supp. 938, 949 (E.D. La. 1996).

In this case, Bolden filed a pretrial motion to bifurcate the penalty phase hearing. He argued that the government's evidence of other crimes was relevant only to a non-statutory aggravating factor but would invite the jury to resolve the eligibility issues, his mental state and the alleged statutory aggravating factors, based on his bad character as evidenced by his criminal history. The district court denied the motion, explaining that the jury would follow the court's eligibility instructions. On appeal, Bolden argues this issue very differently, asserting that the government's extensive victim impact evidence "enhanced the risk" that the jury would find him eligible for death despite the government's weak proof of either statutory aggravating factor. He provides no citation to the voluminous record establishing that he made this argument to the district court, either before or during the sentencing hearing.

The government argues that bifurcation is statutorily impermissible.[7] The only circuit to address this issue under the FDPA concluded that the statute contemplates but does not require a single penalty phase proceeding and encouraged district courts ruling on motions to trifurcate "to consider carefully the ramifications of presenting . . . evidence that would otherwise be inadmissible in the guilt phase . . . to a jury that has not yet made findings concerning death eligibility." United States v. Fell, 531 F.3d 197, 240 n.28 (2d Cir. 2008). We agree that is a sound reading of the statute.

---

[7]We note the government requested bifurcation in Jordan, 357 F. Supp. 2d at 903, to ensure the jury would consider at the selection phase hearsay evidence that might be inadmissible under the Confrontation Clause at the eligibility phase.

As no case has held that bifurcation is mandatory, we think it obvious that the ruling on a motion to bifurcate the penalty phase of an FDPA proceeding is reviewed for abuse of discretion. Such a motion should not be routinely granted because it further extends and complicates what is already a long and complicated proceeding. Moreover, as this case illustrates, penalty phase evidence such as prior crimes may be relevant to both statutory and non-statutory aggravating factors. See 18 U.S.C. §§ 3592(c)(2)-(4), (10), (12), (15). In such cases, the risk of improper spillover will be negligible if the jury is properly instructed and is in any event outweighed by the risk of unnecessary protraction and confusion.

Bolden moved to bifurcate based on the risk that other crimes evidence would prejudice the jury's consideration of eligibility issues. Bolden does not argue that risk on appeal. Instead, he argues that the government's victim impact evidence "enhanced the risk," an issue not pursued in the district court. In its final penalty phase instructions, the court carefully instructed the jury:

> You many not consider the victim impact evidence in deciding the preliminary issues of whether the defendant is at least 18 years old, whether he acted with a mental state listed in Instruction No. 3, or whether any statutory aggravating circumstances in Instruction No. 4 exists beyond a reasonable doubt. If you make the findings on those three preliminary issues which are required before the death penalty can be considered, you many consider the victim impact evidence . . . . You may not, however, permit the victim impact testimony to overwhelm your ability to follow the law.

Jurors are presumed to follow their instructions, and there is no indication in the record that they did not do so. Shannon v. United States, 512 U.S. 573, 584-85 (1994). The court did not abuse its discretion in denying the motion to bifurcate.

## V. Other Pretrial Issues

**A. Motion To Suppress.** At a proffer interview in January 2003, Price told investigators that Bolden hid the handgun used to shoot Ley under a gutter behind Bolden's rented residence. FBI Agent Terrence McGinnis left the interview, drove to the residence, and entered the backyard. He saw a white plastic bag peeking out from under a gutter, removed the bag, and found the murder weapon, a loaded .22 caliber revolver. Bolden argues the district court should have suppressed the handgun because it was found during a warrantless search of his residence conducted without the consent of Bolden or his landlord. The district court denied the motion to suppress for lack of standing, that is, a subjective expectation of privacy in the exterior of his former residence that was objectively reasonable. See United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994); United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991), cert. denied, 503 U.S. 983 (1992).

After a hearing, the district court found that Bolden's landlord initiated eviction proceedings when she heard of his arrest because he was delinquent on rent payments. The eviction was final in November 2002, the landlord retook possession in early December, and the residence was vandalized and robbed well before Price's proffer interview. Bolden argued that the landlord's history of forgiving his rent deficiencies and the fact that eviction notices were returned undelivered gave him a reasonable expectation of privacy in the premises. The district court disagreed, noting that Bolden knew he was facing eviction before killing Ley, yet made no attempt to prevent eviction and asserted no continuing possessory interest in the residence after his arrest:

> [T]he defendant's lack of any possessory interest in the premises at the time of the search, his failure to exclude others from entering the premises, and his failure to take precautions to maintain privacy support the conclusion that the defendant had no subjective expectation of privacy and that no such expectation was objectively reasonable.

-13-

The court's finding that Bolden had no subjective expectation of privacy is not clearly erroneous. See Kiser, 948 F.2d at 423 (standard of review). And on these facts, we agree with the court's legal conclusion that any subjective expectation of privacy in the exterior of his former residence was not objectively reasonable. See United States v. Hoey, 983 F.2d 890, 892 (8th Cir. 1993); United States v. Rambo, 789 F.2d 1289, 1295-96 (8th Cir. 1986). The motion to suppress was properly denied.

**B. Motion To Quash a Venire Panel.** During voir dire, the district court asked whether any member of one panel had read or heard anything about Bolden's alleged crime. Prospective juror 168 responded:

> Close friend of mine works with the victim's aunt. And when I was telling him about my jury duty here, he told me what she had told him about what happened and the family's wishes and things like that.

He later stated, "I think what [my friend] told me may influence my decision . . . [p]ossibly in the second phase, if there was a second phase." Bolden made no contemporaneous objection but later moved to quash the entire panel. The district court denied the motion, noting the panel could not infer from 168's statement that Ley's family favored the death penalty. The court struck 168 for cause. It later instructed the jury:

> You are not to be influenced by the speculation concerning what sentence you think the victim's family might wish to see imposed on the defendant. There is no evidence before you concerning what opinions the members of the victim's family might have on what sentence is imposed. Indeed, there is no evidence that the family members of the victim have any opinions on the issue at all.

On appeal Bolden argues the district court erred in refusing to quash the panel, an issue we review for abuse of discretion. We agree with the district court that juror 168's ambiguous, unsolicited statement did not so infect the panel with possible bias

-14-

as to require that it be quashed. Bolden's counsel spent portions of the next three days exhaustively questioning each potential juror for bias and preconceptions. Moreover, striking juror 168 for cause and cautioning the jury not to speculate about what sentence Ley's family might want were adequate protections against possible improper prejudice. There was no abuse of discretion. See United States v. Rosnow, 977 F.2d 399, 411-12 (8th Cir. 1992), cert. denied, 507 U.S. 990 (1993).

## VI. Guilt Phase Issues

**A. Separate trial of the Felon-in-Possession Charge.** Prior to trial, Bolden moved for a separate trial of the felon-in-possession count. See Fed. R. Crim. P. 14(a). The district court denied the motion, concluding that Bolden would not be prejudiced by the joinder because a stipulation ensured that the jury would know only the fact of his prior felony convictions, not the facts underlying those convictions, see Old Chief v. United States, 519 U.S. 172, 186-92 (1997), and because the court would instruct the jury to consider each count separately.

Bolden argues the court abused its discretion by denying separate trials. This contention is without merit. As the district court noted, we have repeatedly upheld the denial of this motion when the parties have entered into such a stipulation. See United States v. Brown, 70 F.3d 979, 980 (8th Cir. 1995), and case cited, cert. denied, 517 U.S. 1114 (1996). Bolden cites no authority for his contention that trial courts have a greater duty to grant separate trials in capital cases. Here, the district court instructed the jury that it could not consider Bolden's previous convictions when determining whether the government proved the other counts. The court did not abuse its discretion in denying separate trials. See United States v. Crouch, 46 F.3d 871, 875 (8th Cir.) (standard of review), cert. denied, 516 U.S. 871 (1995).

**B. Testimony of Dominick Price.** Bolden challenges three evidentiary rulings arising out of government witness Price's testimony. First, he contends that the district court prejudicially limited cross-examination. On direct exam, Price testified

-15-

that he and Edwards were childhood friends and Bolden persuaded the two younger men to assist in the bank robbery. During cross exam, Price admitted he saw Edwards in jail after their arrest and the two men fought. Bolden's counsel asked Price to elaborate, the government objected, and the district court sustained the objection, explaining that the three men voluntarily committed the crime and it was irrelevant whether Edwards and Price later became enemies while in jail. Bolden argues the court abused its discretion because this testimony would have impeached Price's credibility and the government's attempt to portray Price as remorseful.[8]

"We will not reverse a trial court's decision to limit cross-examination absent a clear abuse of discretion and a showing of prejudice to the defendant." United States v. Purkey, 428 F.3d 738, 753 (8th Cir. 2005) (quotations omitted), cert. denied, 127 S. Ct. 433 (2006). As the district court noted, the relationship between Price and Edwards after the crime was not relevant to Bolden's guilt or his role in the offense. Thus, the question is whether a reasonable jury would have gained a significantly different impression of Price's credibility had the court allowed Bolden to pursue the proposed line of cross-examination. United States v. Beckman, 222 F.3d 512, 524 (8th Cir. 2000). A review of the record persuades us that the answer to this question is no. Bolden's cross exam of Price was extensive (102 pages of the trial transcript). The jury heard about Price's drug dealings with Bolden and others, and Price's prior arrests for disturbing the peace, petty larceny, motor vehicle theft, assault, disturbing the peace, and unlawful use of a firearm. There was no clear abuse of discretion.

Second, Bolden argues that the district court abused its discretion in denying his request for re-cross exam regarding possible coaching Price may have received during an observed conversation with government counsel, or while the government's case agent was together with Price in a holding cell. Government counsel explained

---

[8]His argument that this testimony was also relevant to penalty-phase issues was not preserved in the district court and cannot survive plain error review. See Revels v. Vincenz, 382 F.3d 870, 877 (8th Cir. 2004), cert. denied, 546 U.S. 860 (2005).

that, in the observed conversation, he declined Price's offer to explain the incident with Edwards in jail. Counsel explained that the case agent was in the holding cell only because there was a problem removing Price's shackles. When Bolden's counsel was unable to point out discrepancies between Price's direct and redirect testimony, or instances when his memory appeared to be refreshed or his answers shaded, the district court denied the request. There was no abuse of the court's wide discretion to restrict re-cross exam, particularly when new matters have not been raised on redirect. United States v. Ball, 499 F.3d 890, 897 (8th Cir. 2007).

Finally, Bolden argues that the district court erred by allowing Price to testify to a legal conclusion. During cross exam, Price testified:

> [Defense counsel]: And didn't you decide that you, Robert, and Corteze were going to split the money? Whatever was taken, was going to be split three ways?
>
> [Price]: Equally, yes.
>
> [Counsel]: Yes. All of you were going to be treated equally?
>
> [Price]: Yes, sir.
>
> [Counsel]: Because you were all equal participants?
>
> [Price]: Yes, sir.

On redirect, government counsel referred to this exchange and asked Price whether he was an equal participant in the shooting of Ley. The district court overruled Bolden's objection that the question called for a legal conclusion, and Price answered, "no." On appeal, Bolden argues that this opinion testimony improperly allowed the government to negate two statutory mitigating circumstances, that an equally culpable co-defendant would not be punished by death, and that neither Price nor Edwards would serve a death sentence or a life sentence for the offense.

-17-

Opinion testimony by a lay witness is not *per se* inadmissible, even if it addresses an ultimate issue. Fed. R. Evid. 701, 704(a). Here, the government's inquiry was a fair response to the testimony elicited on cross exam because it addressed the distinction between being "equal participants" in the planned robbery and in the unplanned murder of Ley. "The trial court does not abuse its discretion by allowing the use of evidence on redirect examination to clarify an issue that was opened up by the defense on cross-examination -- even when this evidence would otherwise be inadmissible." United States v. Braidlow, 806 F.2d 781, 783 (8th Cir. 1986). Moreover, the question did not elicit an improper legal opinion. While the defense was no doubt pursuing a legal question, equal culpability, Price was testifying from the lay perspective of equal sharing or participation. When the government went further and asked Price whether he deserved the death penalty for his role in the crime, the district court halted the inquiry. There was no abuse of the district court's wide discretion to control the scope of redirect examination. Braidlow, 806 F.2d at 783 (standard of review).

**C. Agent McGinnis's Notes.** Prior to trial, the district court ordered that government agents retain any rough notes that might concern Bolden's case, and the government agreed to provide Bolden with exculpatory information and any promises made in exchange for witness testimony. See generally Giglio v. United States, 405 U.S. 150 (1972). At trial, FBI agent McGinnis testified that he took notes during the portion of Price's proffer interview he attended before proceeding to Bolden's residence, which contradicted the government's pretrial claim that only two Assistant United States Attorneys took notes during the proffer. Defense counsel complained that, in failing to turn over McGinnis's notes, the government violated both Brady v. Maryland, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500(b). Government counsel represented that he had not known the notes existed, had now reviewed the notes, and concluded they contained no Brady materials. The district court ruled that Bolden did not make a sufficient showing that the notes contained Brady or Jencks Act materials. Bolden challenges that ruling on appeal.

-18-

(1) To establish a Brady violation, Bolden must show that the prosecution suppressed material evidence favorable to the defense. United States v. Van Brocklin, 115 F.3d 587, 594 (8th Cir. 1997), cert. denied, 523 U.S. 1122 (1998).  Materiality turns on "whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Clay v. Bowersox, 367 F.3d 993, 1000 (8th Cir. 2004) (quotation omitted), cert. denied, 544 U.S. 1035 (2005).  Bolden argues the notes might contain exculpatory information because there was a discrepancy between McGinnis's testimony at a pretrial hearing and his testimony at trial concerning whether Bolden told Price the gun was hidden under a gutter at Bolden's residence.  Review of the notes, Bolden argues, might have impeached Price's trial testimony and "bolstered doubts that Bolden was the gunman." However, the alleged discrepancy is based upon a portion of McGinnis's cross exam during the pretrial hearing.  McGinnis clarified the point during redirect.  Thus, viewed in total, McGinnis's pretrial and trial testimony were consistent.   Bolden further argues that the notes could have exposed Price's motivations for testifying but offers no support for this supposition.  The government disclosed all promises it made to Price in exchange for his cooperation, and defense counsel thoroughly cross-examined Price on the subject.  Bolden failed to show that the government suppressed material exculpatory evidence.[9]

(2)  As relevant here, the Jencks Act requires the government to produce, on motion of the defendant after a government witness has testified, "a written statement made by said witness and signed or otherwise adopted or approved by him" relating to the witness's testimony.  18 U.S.C. § 3500(e)(1).  Here, McGinnis testified his notes contained only statements made by Price.  Thus, the notes were not a "statement made by said witness," and Bolden made no showing that Price signed the notes or

---

[9]With little elaboration, Bolden also argues the government should have provided all rough notes from police interviews of persons who witnessed the shooting.  This argument is without merit.  He made no showing that any rough interview notes even existed.  Van Brocklin, 115 F.3d at 595.

-19-

otherwise approved them.  See United States v. Madrigal, 152 F.3d 777, 782 (8th Cir. 1998).  Accordingly, the district court correctly ruled that the notes were not subject to review under the Jencks Act.  See United States v. New, 491 F.3d 369, 376-77 (8th Cir. 2007) ("the purpose of the disclosure requirement is to assist the defense in cross-examining the witness who made the statement, not with questioning some other witness").  Bolden argues on appeal that the notes were Jencks Act material regarding McGinnis's investigation.  That contention was not raised in the district court and cannot survive plain error review.  See United States v. Grajales-Montoya, 117 F.3d 356, 363 (8th Cir.), cert. denied, 522 U.S. 1007 (1997).

## VII. Other Penalty Phase Issues

**A. Non-Statutory Aggravating Factors.** After listing the statutory aggravating factors, the FDPA provides that the jury "may consider whether any other aggravating factor for which notice has been given exists."  18 U.S.C. § 3592(c).  In this case, the government gave notice, the district court submitted, and the jury found three non-statutory aggravating factors: obstruction of justice, other criminal conduct, and victim impact.  Bolden appeals these findings on various grounds.  We review the district court's evidentiary rulings for abuse of discretion, Allen, 247 F.3d at 778, and Bolden's constitutional contentions *de novo*, Purkey, 428 F.3d at 761.[10]

(1) Obstruction of Justice.  During the penalty phase, the government presented evidence that Bolden lied to police after being arrested, threatened Price and Edwards if they spoke about the crime, wiped prints off and hid the murder weapon, and told Edwards to change his appearance.  The government argued that this aggravating factor was established by evidence that Bolden killed Ley to prevent him from identifying Bolden and then obstructed the investigation by lying to the police and

---

[10]The contention that the government violated his Fifth and Sixth Amendment rights by failing to charge non-statutory aggravating factors in the indictment is foreclosed by our decision in Purkey, 428 F.3d at 748-50.

other post-offense conduct. The jury found as a non-statutory aggravating factor that Bolden obstructed a criminal investigation and that this factor supported imposition of the death penalty.

Bolden argues his post-offense conduct lacked sufficient relevance to whether he should be sentenced to death. We disagree. Other courts have approved use of an obstruction of justice non-statutory aggravating factor based upon post-offense conduct. See, e.g., United States v. Higgs, 353 F.3d 281, 322-23 (4th Cir. 2003) (disposing of murder weapon, destroying physical evidence, and directing witnesses to lie); United States v. Edelin, 134 F. Supp. 2d 59, 76-77 (D.D.C. 2001) (threatening witnesses). This is consistent with the treatment of obstruction under the Sentencing Guidelines. U.S.S.G. § 3C1.1. The district court did not err in submitting this non-statutory factor based in part on Bolden's post-offense conduct.

Bolden further argues that basing this factor on the killing of Ley renders it unconstitutionally vague because all murders eliminate a witness and therefore the factor is only a rational aggravator if the witness is eliminated after the suspect's arrest. Again we disagree. The government presented evidence that, after immobilizing Ley with the initial shot, Bolden paused a few seconds before firing the fatal shot into Ley's head, evidence the murder was motivated in part to prevent Ley from identifying Bolden. Thus, the district court did not err in submitting this non-statutory aggravating factor. Its relative weight was solely for the jury to decide.

(2) Other Criminal Conduct. At closing argument, the government argued that the jury should find "other criminal activity" as a non-statutory aggravating factor based on Bolden's conviction of non-capital offenses during the guilt phase -- conspiracy to commit bank robbery and being a felon-in-possession of a firearm -- and on his 1993 Michigan conviction for resisting and obstructing a police officer. The jury found this aggravating factor beyond a reasonable doubt and that it supported imposition of the death penalty. It is well-established that the government may offer

-21-

evidence of "other criminal acts" as a non-statutory aggravating factor.  See Allen, 247 F.3d at 789 and cases cited.

Bolden argues that this non-statutory factor allowed the government to submit the same evidence to support multiple aggravating factors, creating the risk that the jury would give too much weight to the aggravating factors, thereby skewing its weighing of the aggravating and mitigating factors in deciding whether to impose the death penalty.  Though the concern is legitimate, see Stringer v. Black, 503 U.S. 222, 232-33 (1992), the Supreme Court has never held "that aggravating factors could be duplicative so as to render them constitutionally invalid."  Purkey, 428 F.3d at 762, quoting Jones v. United States, 527 U.S. 373, 398 (1999) (plurality opinion).  The government based the pecuniary gain statutory factor on Bolden's desire to rob the bank.  It based the obstruction of justice non-statutory factor on his motive to kill Ley to eliminate a witness.  And it based the "other criminal activity" non-statutory factor in part on his possession of a firearm while conspiring to rob the bank.  "[T]he same facts can support different inferences that form different aggravators."  Purkey, 428 F.3d at 762.  The district court properly instructed the jurors that in weighing the aggravating and mitigating factors, they were not simply to count each factor and reach a decision based on which number is greater; rather, they should individually consider the weight and value of each factor before deciding whether a sentence of death is justified. There was no unconstitutional duplication.

Bolden further argues that, other than the conspiracy conviction, these crimes lacked sufficient relevance to the decision.  He cites no authority supporting the assertion that the district court should have struck the other convictions on this ground.  The district court did not allow the government to introduce less relevant aspects of Bolden's criminal history, such as misrepresentations to his landlord and employer, improperly received unemployment benefits, and multiple driving violations. He argues that the Michigan convictions were too remote and allowed the jury to consider unadjudicated drug trafficking.  The record does not support this assertion.  The court struck testimony regarding drug sales in 1994 that were well

before Bolden's 1995 Michigan conviction.[11] The government did not argue that the Michigan drug offenses or their underlying conduct supported this non-statutory factor, and the jury was instructed that these convictions could not constitute "other crimes" for purposes of this factor. Moreover, in <u>Lee</u>, 274 F.3d at 494-95, we affirmed admitting evidence of various unadjudicated offenses.

(3) Victim Impact Evidence. "[T]he Eighth Amendment erects no *per se* bar" to the admission of victim impact evidence and to prosecutorial argument on that subject. <u>Payne v. Tennessee</u>, 501 U.S. 808, 827 (1991). In the FDPA, Congress provided that the government may introduce as a non-statutory aggravating factor "victim impact evidence" including "oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." 18 U.S.C. § 3593(a). Evidence "about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed [and t]here is no reason to treat such evidence differently than other relevant evidence is treated." <u>Payne</u>, 501 U.S. at 827. However, admission of evidence "so unduly prejudicial that it renders the trial fundamentally unfair" violates the Due Process Clause. <u>Id.</u> at 825.

Bolden contends that the district court erred by allowing sixteen victim impact witnesses to testify during the penalty phase. He argues the testimony was cumulative, unfairly prejudicial, and "left the jury one small step removed from actual attendance at the victim's memorial service." He notes that sixteen witnesses far

---

[11]His contention that the district court erred in denying a mistrial based on this testimony is without merit. <u>See Allen</u>, 247 F.3d at 772 (standard of review). The jury is presumed to follow the district court's prompt instruction to disregard the question and answer. <u>Richardson v. Marsh</u>, 481 U.S. 200, 206-07 (1987).

exceeded the number this court has previously approved,[12] and that their testimony took up over 80% of the government's penalty phase case-in-chief. Acknowledging that no appellate court has vacated a federal death sentence on this ground, Bolden asserts that no appeal has presented "the voluminous amount and prejudicial quality" of impact evidence concerning a single victim.

Bolden cannot challenge the victim impact testimony by Ley's parents and relatives. See Payne, 501 U.S. at 827. He contends that allowing Ley's friends, coworkers, and pastor to testify about Ley's relationship with his girlfriend, career aspirations, and the affect of Ley's death on his parents inflamed the jury, leaving it unable to fairly weigh the aggravating and mitigating factors. However, Ley's aspirations and relationships and the impact of his death on his family were highly relevant to establishing this non-statutory factor. Though portions of this testimony overlapped, we agree with the district court it was not so cumulative as to confuse the issues or create unfair prejudice.[13] Qualitatively, this evidence was similar to the victim impact evidence we upheld in United States v. Johnson, 495 F.3d 951, 977 (8th Cir. 2007); United States v. Nelson, 347 F.3d 701, 713-14 (8th Cir. 2003), cert. denied, 543 U.S. 978 (2004); Allen, 247 F.3d at 778-79; and Simmons v. Bowersox, 235 F.3d 1124, 1135 (8th Cir.), cert. denied, 534 U.S. 924 (2001).

Bolden's additional challenges to specific victim impact evidence are without merit. Numerous witnesses read passages they wrote in a memorial journal. This was probative of Ley's character, not inflammatory, and substantially similar to evidence deemed proper in other cases. See, e.g., Johnson, 495 F.3d at 976-77; Chanthadara, 230 F.3d at 1274. The government played the tape of a 911 call from Ley's girlfriend

_____

[12]In United States v. McVeigh, 153 F.3d 1166, 1216 (10th Cir. 1998), cert. denied, 526 U.S. 1007 (1999), 38 victim impact witnesses testified about 168 victims of the Oklahoma City bombing.

[13]The court observed near the end of the victim impact testimony that the witnesses had been "restrained" and had done their best to control their emotions.

-24-

requesting a police escort to the hospital on the afternoon he was killed. The probative value of this evidence outweighed the risk of unfair prejudice because it best captured the emotional impact of Ley's death on his loved ones. Admission of a collection of photographs taken at a memorial service held by the bank where Ley worked, plus resolutions in Ley's honor from the Missouri House of Representatives and the St. Louis Board of Alderman, were relevant to Ley's "uniqueness" as a human being and the impact of his death, Payne, 501 U.S. at 823-27, and not so unduly prejudicial as to render the trial fundamentally unfair. Finally, a co-worker who ran to assist Ley when he was shot graphically described Ley's condition and the impact that experience had on the witness's life. This was clearly admissible as the most probative evidence of the effect of Bolden's crime on his victim. It was undoubtedly prejudicial, but not unfairly so.

The district court placed few limits on Bolden's mitigating evidence; he argued thirty-two mitigating factors to the jury. See Paul, 217 F.3d at 1002. The number of victim impact witnesses alone does not establish unfair prejudice. After the sixteen testified on Monday afternoon, Tuesday morning, and Wednesday morning, the jury heard closing arguments and instructions on Thursday. After the court's cautionary instructions regarding victim impact testimony and a recess on Friday, the jury began deliberations the following Monday. It returned the verdict on Tuesday, finding all five aggravating factors and many of the thirty-two mitigating factors. This timing does not suggest that the sentence was the product of passion rather than careful, reasoned judgment.

**B. Mitigation Issues.** The FDPA defines "mitigating factors" to include "factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8). Here, the district court submitted thirty-two distinct mitigating factors, twenty-one of which were found to exist by at least one juror. Bolden argues that the court erred by refusing to submit three additional factors: (a) "The execution of Robert Bolden may not necessarily alleviate the victim's or victim's family suffering."

-25-

(b) "Robert Bolden's execution will cause his family great emotional pain and distress." (c) "The sentence of life in prison without the possibility of release is an adequate harsh alternative punishment that will protect society from further risk of criminal conduct by Robert Bolden." The court ruled that the record lacked evidence to support the submission of these three factors.

As to the first proposed factor, the government was precluded from eliciting testimony concerning the Ley family's desires for punishment. Parker v. Bowersox, 188 F.3d 923, 931 (8th Cir. 1999), cert. denied, 529 U.S. 1038 (2000), and cases cited. Thus, there was no evidence about the effect of Bolden's execution on the Ley family's suffering. As to the second, Bolden elicited substantial testimony from his children about his positive impact on their lives, and the district court submitted seven mitigating factors related to Bolden's positive impact on his family and their love for him. Any additional instruction would have been duplicative. As to the third, it was the province of the jury to decide whether life in prison was "an adequate harsh punishment" for Bolden's crimes. The government did not submit Bolden's future dangerousness as a non-statutory aggravating factor, which obviated any need for a mitigating instruction whether life in prison would adequately protect society from the risk of future criminal conduct.

"Special instructions are necessary when the jury could not otherwise give *meaningful effect* to a defendant's mitigating evidence." Abdul-Kabir v. Quarterman, 127 S. Ct. 1654, 1668 n.14 (2007) (emphasis in original). Here, in addition to submitting thirty-two factors, the district court instructed the jurors to consider any "mitigating factors whether or not specifically argued by defense counsel which are established by a preponderance of the evidence." There was no abuse of the court's substantial discretion to fashion appropriate instructions.

Bolden further argues that the district court placed unconstitutional limits on his mitigation evidence. Prior to trial, the district court granted the government's motion *in limine* to prevent Bolden from introducing unsworn allocution evidence during the

penalty phase without being subject to cross-examination. During the penalty phase, he notified the government that mitigation witness John Wilson would testify that he helped Bolden prepare a "statement of accountability" to explain his remorse to Ley's family and friends. The government objected, and the district court ruled that Bolden could not introduce the statement nor have Wilson testify about assisting Bolden in preparing it, as both constituted unsworn allocution. Bolden argues the court abused its discretion because this ruling contravened the Eighth Amendment by preventing him from introducing relevant mitigation evidence.

The FDPA permits introduction of relevant mitigating evidence even if inadmissible under the Federal Rules of Evidence, but "this does not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes." Purkey, 428 F.3d at 756. Among other limitations, the defendant "does not have a statutory right to make statements to a jury during the penalty phase of an FPDA trial without being subject to cross-examination." Id. at 761. Here, the district court did not abuse its discretion in excluding an unsworn, unsigned, undated statement lacking any indicia of reliability unless the government could cross examine Bolden about its creation. We also note that Bolden elicited testimony about his post-offense remorse from another mitigation witness.

**C. Penalty Phase Evidentiary Issues.** (1) Bolden argues that the district court abused its discretion by allowing the government to use a styrofoam head to illustrate the trajectory of the bullets as they hit Ley during the testimony of a forensic pathologist. Because the head was inflexible, he contends, it provided an arbitrary basis for the jury to determine whether the shots were fired intentionally or accidentally. After obtaining assurances that the pathologist would limit her use of the demonstrative exhibit, the court ruled that use of the skull would not be unfairly prejudicial and, alternatively, that any prejudice was outweighed by the probative value of this evidence. There was no abuse of the court's substantial evidentiary discretion. United States v. Pirani, 406 F.3d 543, 555 (8th Cir.) (en banc) (standard of review), cert. denied, 546 U.S. 909 (2005).

-27-

(2) Bolden argues the district court abused its discretion by allowing the government to ask mitigation witness Mona Muhammad if she was biased against the government because her son was convicted of first degree murder following an investigation by two case agents who investigated Bolden.  Cross exam of a penalty phase mitigation witness for bias is proper.  Purkey, 428 F.3d at 760.  Moreover, Rule 611(b) of the Federal Rules of Evidence expressly allows cross exam concerning "matters affecting the credibility of the witness."  We grant broad deference to the district court's determination of the appropriate scope of cross exam.  United States v. Crenshaw, 359 F.3d 977, 1002 (8th Cir. 2004).  Here, the inquiry did not create a risk of unfair prejudice, confuse the issues, or mislead the jury.  See § 3593(c).

(3) During cross exam, the government asked Bolden's aunt if she was aware Bolden attempted to sell his daughters back to their mother for $5,000.  Bolden objected before the witness could answer.  After a sidebar conference, the district court sustained the objection and instructed the jury to disregard the question.  On appeal, Bolden argues the question was improper.  As the district court granted the relief he requested, no issue was preserved for appellate review.

**D. Penalty Phase Instruction Issue.**  Bolden first argues that the district court's preliminary instruction at the start of the penalty phase concerning the possible penalties for his conviction on the felon-in-possession count misled the jury into believing he might not serve the rest of his life in prison if not sentenced to death.  This contention is frivolous.  The court's thorough final instructions at the conclusion of the penalty phase accurately stated the law and unambiguously instructed, with respect to the bank robbery count: "if you determine that death is not justified . . . you must record your determination that the defendant be sentenced to life imprisonment without possibility of release," as 18 U.S.C. § 2113(e) mandates.

Bolden next argues that the district court erred in refusing to give a proffered instruction reflecting his contention that, under § 3593(e), the jury is never *required* to impose a sentence of death, even if it has found that the aggravating circumstances

-28-

sufficiently outweigh the mitigating circumstances to justify a death sentence. We have rejected this contention in many cases. See, e.g., Allen, 247 F.3d at 779-82; Purkey, 428 F.3d at 762-63. The district court's instructions were consistent with the FDPA as construed in these decisions. Moreover, the court's instruction adequately incorporated Bolden's contention that the jury was not required to impose a death sentence: "If you unanimously conclude that the aggravating factor or factors . . . sufficiently outweigh the mitigating factor or factors . . . and that *therefore* death is the appropriate sentence . . . you must record your determination that a sentence of death shall be imposed" (emphasis added).

**E. The Mental State Gateway Issue.** The FDPA provides that, for the defendant to be eligible for a death sentence, the jury must find that he

> (A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used . . . and the victim died as a direct result of the act; or (D) intentionally . . . engaged in an act of violence, knowing that the act created a grave risk of death . . . such that participation . . . constituted a reckless disregard for human life and the victim died as a direct result of the act.

18 U.S.C. § 3591(a)(2). Over Bolden's objection, the district court submitted and the jury found that Bolden had acted with all four mental states in committing both capital offenses. Bolden argues that this enhanced the risk that jurors would inflate the weight of mental state evidence during the penalty phase. We disagree.

Numerous decisions have approved submission of multiple mental states in FDPA cases. See United States v. Jackson, 327 F.3d 273, 300-01 (4th Cir.), cert. denied, 540 U.S. 1019 (2003); United States v. Webster, 162 F.3d 308, 323-24 (5th Cir. 1998), cert. denied, 528 U.S. 829 (1999); United States v. Cheever, 423 F. Supp. 2d 1181, 1199-1200 (D. Kan. 2006); Natson, 444 F. Supp. 2d at 1308-09. We agree with these decisions. Here, as in Webster, the court instructed the jury to weigh the

-29-

aggravating and mitigating factors with no mention of the "gateway" element of intent.[14] Moreover, the verdict form segregated the mental state inquiry from the aggravating and mitigating factors and "made clear the sequential nature of the process." Webster, 162 F.3d at 324. Not every capital crime may support the submission of all four mental states, but the district court did not err in concluding that the evidence warranted submitting all four in this case.

**F. The Government's Summation.** Bolden argues that the government's "incendiary" penalty phase closing argument denied him a fair trial. He objects to many portions of the argument, but none of the arguments made on appeal were preserved with contemporaneous objections in the district court. Accordingly, our review is for plain error. United States v. Robinson, 110 F.3d 1320, 1326 (8th Cir.), cert. denied, 522 U.S. 975 (1997). To obtain relief, Bolden must show that an error occurred, that it was plain, that it affected his substantial rights, and that it seriously affected the fairness, integrity or public reputation of the judicial proceedings. To show that an error affected his substantial rights, he must "demonstrate[] a reasonable probability that he would have received a more favorable sentence with the . . . error eliminated." Pirani, 406 F.3d at 551.

Most of the arguments Bolden challenges were not improper. For example, Bolden notes that the prosecutor repeatedly de-emphasized and belittled his proposed mitigating factors, but "as long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight." Johnson, 495 F.3d at 978. The prosecutor did

---

[14]Bolden relies on United States v. McCullah, 76 F.3d 1087, 1111-12 (10th Cir. 1996), cert. denied, 520 U.S. 1213 (1997). McCullah is distinguishable because it turned on the submission of duplicative aggravating factors that included mental state components under 21 U.S.C. § 848(n), a different federal death penalty statute. The Tenth Circuit has more recently held that duplication "between the gateway [intent] factors and aggravating factors does not undermine the constitutional validity" of a death sentence under the FDPA. Chanthadara, 230 F.3d at 1261.

improperly ask the jury to impose the death penalty on behalf of the Ley family, an argument for which there was no supporting evidence. Rather than object, Bolden later requested an instruction that the jury not speculate about the family's wishes. The district court gave that instruction. After careful review of all the challenged comments, we conclude they were isolated and insubstantial in context and far less egregious than statements we have deemed harmless in other capital cases. See e.g., Johnson, 495 F.3d at 979-80; Ortiz, 315 F.3d at 903. We conclude there was no plain error and, alternatively, that Bolden has failed to establish plain error that substantially affected his rights.

For the foregoing reasons, the judgment of the district court is affirmed.

EBEL, Circuit Judge, concurring.

I concur fully in the judgment and opinion of the court.

I write separately only to address in greater detail Defendant-Appellant Bolden's argument pertaining to the application of one of the statutory aggravating factors that the jury found in this case. Bolden argues that the statutory aggravator that applies when a defendant "has previously been convicted of 2 or more State or Federal offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance," 18 U.S.C. § 3592(c)(10), does not apply to him. Bolden concedes that he has one such conviction for distributing cocaine. But Bolden argues that the second conviction on which the Government relied—a 1993 Michigan conviction for attempted possession of drugs with the intent to distribute—does not qualify.

Of course, possession of drugs with the intent to distribute is a crime "involving the distribution of a controlled substance." See United States v. Matra, 841 F.2d 837, 843 (8th Cir. 1988), abrogated on other grounds, United States v. McKinney, 120 F.3d 132, 133 (8th Cir. 1997). It is, however, a more difficult issue whether this statutory

aggravator includes a conviction for the <u>attempt</u> to possess drugs with the intent to distribute.

There is, as far as I can tell, no published case law interpreting and applying this statutory aggravating factor. The language of this aggravator is certainly broad enough to include attempts to commit the crime of distribution of a controlled substance because it contains the very inclusive word "involving"—"<u>involving</u> the distribution of a controlled substance." (Emphasis added.)

Further support for the inclusion of attempted possession with the intent to distribute drugs in this aggravator may be found in the Supreme Court's reasoning in <u>James v. United States</u>, 550 U.S. 192, 127 S. Ct. 1586 (2007). <u>James</u> applied, not the Federal Death Penalty Act ("FDPA"), but the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). <u>See</u> 127 S. Ct. at 1590. Nevertheless, the ACCA provides a relevant analogy to the case here because the ACCA similarly includes statutory provisions that expressly include attempt offenses, and those that do not. In particular, the ACCA defines a violent felony under that Act to include

> any crime punishable by imprisonment for a term exceeding one year . . . that—
>
> > (I) has as an element the use, <u>attempted</u> use, or threatened use of physical force against the person of another; or
> >
> > (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B) (emphasis added). Like the FDPA's statutory aggravators, the ACCA thus expressly includes attempt offenses in one section, but does not mention them in the very next section of the statute. Nevertheless, the <u>James</u> Court rejected the argument that, because Congress expressly included attempts in one

section, attempt offenses could not be included in the next section. See James, 127 S. Ct. at 1591-92. In its discussion of this issue, James concluded in dicta that the statutory language addressing an offense that "involves use of explosives" is broad enough to include an attempt offense: "An unsuccessful attempt to blow up a government building . . . would involve the use of explosives."[15] Id. at 1592 (quotation, alterations omitted).

But when one considers the whole of the statutory aggravating factors set forth in the FDPA, an argument can be made that § 3592(c)(10) does not encompass a conviction for the attempt to possess drugs with the intent to distribute. Of the sixteen statutory aggravating factors available under § 3592(c), four aggravators expressly include attempted offenses. See 18 U.S.C. § 3592(c)(1) ("The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of" one of twenty enumerated federal felonies.) (emphasis added); id. § 3592(c)(2) ("[T]he defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm . . . against another person.") (emphasis added); id. § 3592(c)(4) ("The defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person.") (emphasis added); id. § 3592(c)(16) ("The defendant

---

[15]The specific issue James addressed was whether a prior conviction for attempted burglary was a violent felony under the ACCA. See 127 S. Ct. at 1590. In that case, the parties agreed that attempted burglary did not fall within either § 924(e)(2)(B)(i) or § 924(e)(2)(B)(ii)'s enumerated offense of burglary. See James, 127 S. Ct. at 1591. The James Court held that attempted burglary fell within § 924(e)(2)(B)(ii)'s residual language as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." See James, 127 S. Ct. at 1593-98. In reaching this conclusion, James noted the breadth of the language of that residual clause. See id. at 1597-98.

-33-

intentionally killed or <u>attempted to kill</u> more than one person in a single criminal episode.") (emphasis added). The language specifically including attempts in these four statutory aggravating factors and the conspicuous absence of attempt in the other aggravators suggests that Congress knew how to include attempt offenses when it intended to do so.[16]

Moreover, two of these aggravators, 18 U.S.C. § 3592(c)(2) and (4), specifically use both the terms "involving" and "attempt" together in the same provision. This further suggests that Congress did not intend its use of the word "involving" automatically to include attempt offenses.

"The long established plain language rule of statutory construction requires examining the text of the statute as a whole by considering its context, object, and policy." <u>United States v. Boesen</u>, 541 F.3d 838, 846 (8th Cir. 2008) (quotation omitted). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (quotation, alteration omitted); <u>see also</u> <u>United States v. Sampson</u>, 335 F. Supp. 2d 166, 212-14 (D. Mass. 2004) (applying FDPA and concluding that, because Congress required that the defendant act knowingly in order for some of the statutory aggravators to apply, but did not expressly include a

---

[16]Congress wrote two other statutory aggravating factors using language broad enough to encompass convictions for both attempted and completed offenses. <u>See</u> 18 U.S.C. § 3592(c)(3) ("The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute."); <u>id.</u> § 3592(c)(12) ("The defendant had previously been convicted of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise."). Congress chose not to draft the aggravating factor at issue here in that same fashion.

knowledge requirement in 18 U.S.C. § 3592(c)(11), applying when the victim was "particularly vulnerable due to old age, youth, or infirmity," Congress did not then intend to require proof that the defendant knew that his victim was vulnerable before that aggravating factor could apply).

But it is not apparent to me why Congress would expressly include attempt offenses in some of the FDPA's statutory aggravating factors, but not others. And neither party points us to any legislative history that might better explain this seeming inconsistency. It may be that Congress intended to include attempts when the offenses at issue were particularly serious as, for example, offenses involving violence and weapons. But Congress has also often indicated that drug trafficking is serious criminal conduct. On the other hand, the difference in terminology could be explained by the fact that the statutory aggravators in § 3592 were often lifted from other pre-existing statutes, and additional aggravators were added to this section over the years. Thus, the various aggravators often come from different sources and their different language may simply be a consequence of this mixed pedigree with no actual significance intended by Congress between various phraseologies used.

Where a criminal statute is ambiguous, the rule of lenity requires us to give the defendant the benefit of the doubt. See United States v. Santos, 128 S. Ct. 2020, 2025 (2008) (plurality) (noting that, "[u]nder a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them"). And the rule of lenity "applies to sentencing as well as substantive [criminal statutory] provisions." Rowe v. Lockhart, 736 F.2d 457, 461 (8th Cir. 1984); see United States v. Allen, 247 F.3d 741, 767, 769 (8th Cir. 2001) (discussing rule of lenity in addressing claim that multiple sentences of life in prison and death for the same underlying offense amounted to double jeopardy, but concluding rule of lenity did not apply in that case), cert. granted and judgment vacated, 536 U.S. 953 (2002); cf. Rowe, 736 F.2d at 460-62 (discussing rule of lenity, but not applying it in that case to overturn thirty-year sentence for attempted capital murder).

Nevertheless, I am ultimately persuaded that § 3592(c)(10) is not ambiguous, and that that aggravating factor does encompass Bolden's prior conviction for the attempted possession of drugs with the intent to distribute, for several reasons. First, no persuasive reason is apparent to me why Congress would have intentionally desired to exclude attempts under § 3592(c)(10) but to include attempts under many of the other aggravators. Thus, to give meaning to the differences in language between the various aggravators in § 3592(c) would be rank speculation. I do not believe rank speculation should trump the language of § 3592(c) standing alone. Second, James, in a different context, indicated that the fact that Congress expressly included attempted offenses in one subsection of a statute but not in another subsection did not mean that attempted convictions could not be included in a subsection lacking an express reference to attempt. See 127 S. Ct. at 1591-92. Third, the language Congress used in § 3592(c)(10)—prior convictions "involving the distribution of a controlled substance" (emphasis added)—is very broad language that would naturally encompass attempts to possess a controlled substance with the intent to distribute. Indeed, as James made clear, the word "involving" has explicitly been applied to include attempts. In James, the Court in dicta said that an unsuccessful attempt to blow up a government building would constitute a violent felony under the clause in 18 U.S.C. § 924(e)(2)(B)(ii) that reads, "involves the use of explosives."

For these reasons, I agree that § 3592(c)(10) encompassed Bolden's prior conviction for the attempted possession of drugs with the intent to distribute.

_____